Following ore tenus proceedings, the Morgan Juvenile Court terminated the parental rights of T.L.W. (the mother), to her two sons, nine-year-old R.S. and seven-year-old F.W. The court also terminated the parental rights of two men who were the putative father of R.S. and the father of F.W., respectively. The court granted permanent custody to the Department of Human Resources ("the Department"). Only the mother appeals.
Natural parents have a prima facie right to custody of their children, and that right can be overcome only by clear and convincing evidence that the children's best interests will be served by permanently removing them from their parents' custody. R.C.M. v. State Dep't of Human Resources,601 So.2d 100 (Ala.Civ.App. 1991); Varnadore v. State Dep't of HumanResources, 543 So.2d 1194 (Ala.Civ.App. 1989). The following statutory grounds for termination of parental rights, set out in Ala. Code 1975, § 26-18-7, are pertinent here:
 "(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
". . . .
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child;
". . . .
 "(4) Conviction of and imprisonment for a felony;
". . . .
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(b) Where a child is not in the physical custody of its parent or parents . . ., in addition to the foregoing, [the court] shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child. *Page 130 
 "(4) Lack of effort by the parent to adjust his circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
When the State is the petitioner in termination proceedings, the trial court must apply a two-pronged test in determining whether to terminate parental rights. First, the court must find from clear and convincing evidence that the child is dependent; second, the court must determine that there are no viable alternatives to termination of parental rights. Ex parteBeasley, 564 So.2d 950 (Ala. 1990). A trial court's decision in proceedings to terminate parental rights is presumed correct when it is based on ore tenus evidence, as here, and its decision will be set aside only if the record reveals the decision to be plainly and palpably wrong. M.J.G.L. v. StateDep't of Human Resources, 587 So.2d 1004 (Ala.Civ.App. 1991).
The Department has been involved with the mother since 1987, following investigation of a report that one-year-old R.S. had second and third degree burns on his legs. Left unattended in a bathtub, the child had turned on the hot water and scalded his legs. The Department assigned a parenting assistant to work with the mother on stress management and parenting skills. It also provided the mother with day care services when she was sick during her pregnancy with F.W., her second son.
After the birth of F.W., the mother moved out of state. She returned to Alabama in 1990, and, in August of that year, the Department received a report that R.S. was unsupervised and running through the mother's apartment complex at 2:00 a.m. while the mother was drinking and using profanity toward him. Following that report, the Department provided counselling services to the mother. In June 1992, the Department received a third report that the mother had failed to supervise the children.
In April 1993, upon investigation of a fourth report of child neglect, the Department determined that the mother had left seven-year-old R.S. and five-year-old F.W. with F.M., F.W.'s father. The mother had told F.M. and the children that she would be back in 10 minutes, but she was gone for 3 days. After that incident, the Department petitioned for temporary custody of the children. The juvenile court determined that the children were dependent and granted temporary custody to the Department. The children were placed with the maternal grandmother for a short time, but when the grandmother refused to keep the children on a long-term basis, they were placed in a local children's home.
Following the temporary custody hearing, the juvenile court ordered the mother to accomplish the following objectives before she could regain custody of the children: "successfully complete counselling, cooperate with [the] treatment worker, cooperate with [the] parenting assistant, and attend parenting classes. [A]ctively seek [a] job, [and] obtain stable housing." The Department entered into a service agreement with the mother to help her accomplish those goals.
By the time of the judicial review of the June 1993 custody order four months later, the mother had made some progress toward meeting the objectives outlined for her to regain custody of the children. She got a job, and she and F.M., the father of F.W., obtained an apartment together. The Department paid the utilities. The mother visited the children regularly, and she began to comply with the treatment plan mapped out by her counselor. Part of that plan included taking medication for depression and insomnia. It also included outpatient evaluation at Quest, an alcohol and chemical dependency treatment facility. When the mother began outpatient therapy at Quest, she admitted to social workers from the Department that she was addicted to Xanax, cocaine, and alcohol. Quest officials recommended that the mother be admitted for inpatient treatment, but the mother did not follow up on that recommendation.
In November 1993, the Department began to allow the mother to have the children with her for overnight and weekend visits. Then, the mother told a Department social worker *Page 131 
that F.M., her live-in companion, had been violent toward her. The violence escalated to the point that the mother locked herself in the bedroom at night and asked a male friend to stay in the apartment to provide protection for her. The mother's counselor and social worker both advised the mother to ask F.M. to move out of the apartment. The mother followed that advice, and F.M. moved.
On December 17, 1993, the Department returned the children to the mother. Less than two weeks later, when a social worker from the Department visited the mother, the social worker found that the mother had let F.M. move back in. The mother had also been fired from her job and had received an eviction notice. However, the mother soon found another job and another apartment, and when she could not afford to move in, the Department paid her first month's rent and utility deposits and helped her apply for food stamps.
The mother's social worker made weekly home visits after the children were returned to the mother, because the social worker testified, the mother was "backsliding" and was "hard to motivate." The social worker discovered that the mother had stopped seeing her counselor, had bought three puppies she could not afford to care for, and had failed to send F.W. to school with his required medication. According to the social worker, the apartment was a "wreck."
In March 1994, the mother contacted the parenting assistant and told her she was "losing it" and "couldn't cope with the kids." The mother had started drinking again. She had slapped R.S. and had made his lip bleed. Six-year-old F.W. and eight-year-old R.S. were playing on the railroad tracks without supervision. The landlord was threatening eviction if the rent was not paid. The neighbors were complaining that the children had asked them for food. The Department decided to remove the children from the home again, and when a social worker arrived at the apartment the children were there alone and did not know where their mother was. When the children were taken into custody, F.W. appeared to be sick. The following day, he was diagnosed by a physician as suffering from bronchitis, strep throat, scarlet fever, and an ear infection. The children were placed in a local children's home.
Between March and December 1994, the Department scheduled 14 visits between the mother and her children. The mother missed three visits without explanation. She began to attend Alcoholics Anonymous meetings, but then was twice arrested for DUI. She stopped seeing her counselor and failed to attend the Quest programs on a regular basis. At the time of the permanent custody hearing, she was unemployed and was incarcerated on a DUI charge.
Mike Beddingfield, a psychiatric social worker, testified that he began counselling the mother in July 1993. He stated that she was suffering from major depression and addictive disease problems, with a personality disturbance, possibly borderline personality disorder. He gave his opinion that the mother's problems were not superficial and were likely to be recurrent:
 "This is a problem that is on a personality level. It has to do with the person's basic problem-solving strategies. The definition of self. The definition of the world and basic definition of relationship to other — significant other people in her world, children, spouse, boyfriend, girlfriend or whatever.
 "And those types of problems tend to be repetitive in nature. . . . [I]t reoccurs over time."
Beddingfield testified that the mother had suffered a traumatic experience as a teenager. She had been raped by a trusted adult and then was not believed by her own family when she reported the rape. Beddingfield gave his opinion that the trauma had affected her ability to deal with her own children. He testified:
 "[T.L.W.] felt completely abandoned by her mom, by her dad, by her family. And that abandonment seemed to be centered around the trauma at age fourteen. . . .
 "Her experience with her children and I tried to present this to her, was a situation where she was basically repeating her childhood." *Page 132 
Both the social worker and the counselor testified that they had no doubts the mother loved her children and that they loved her.
R.S. and F.W. were determined in April 1993 to be dependent. The trial court's finding that they remained dependent is fully supported by the record. The court's further finding that the mother had not made sufficient efforts to adjust her circumstances to meet the needs of the children, in accordance with the agreements reached with the Department, is also supported by the record. Here, as in T.M.S. v. Elmore CountyDep't of Human Resources, 647 So.2d 746 (Ala.Civ.App. 1994), and B.R.M. v. State Dep't of Human Resources, 626 So.2d 646
(Ala.Civ.App. 1993), the mother embarked on several programs of self-improvement but did not successfully complete them. InT.M.S., this court observed:
 "The trial court acknowledged the mother's testimony that she had attended two parenting classes, that she was willing to learn more about caring for her child, and that she planned to improve her circumstances; however, the trial court also acknowledged other evidence revealing that the mother had failed to make use of available programs and training designed to help her care for her child and to work toward reunification."
647 So.2d at 747.
In B.R.M., the court stated:
 "The record reflects that when the mother placed her children in foster care, she and a DHR caseworker established a case plan by which the mother would work towards regaining custody. This agreement included securing adequate housing, obtaining employment, and utilizing supportive services. The record discloses that the mother entered several drug rehabilitation programs but never completed one, that she never attended counselling sessions, and that she failed to utilize the rehabilitative services DHR made available to her. The evidence supports the trial court's findings that DHR's efforts to reunite the mother with her children were unsuccessful. . . .
626 So.2d at 648.
The juvenile court's finding that the mother was unable or unwilling to discharge her responsibilities to her children, that the mother's conduct or condition rendered her unable to properly care for the children, and that such conduct or condition was unlikely to change in the foreseeable future, is also supported by the record. Mike Beddingfield testified that the mother suffered from major depression, addictive disease problems, and a personality disorder that made it unlikely that she would ever be able to care adequately for her children. Evidence of a mental deficiency is a significant factor for the trial court to consider. See McCulloch v. State Dep't of HumanResources, 536 So.2d 68, 70 (Ala.Civ.App. 1988); Ala. Code 1975, § 26-18-7(a)(2).
This case is particularly troubling because it is evident that the mother loves her children and that they love her. Nevertheless, as this court observed in G.L. v. State Dep't ofHuman Resources, 646 So.2d 81, 84 (Ala.Civ.App. 1994), "although it appears that the mother is genuine in her love and concern for her children, it appears . . . that her limitations are so severe that she [is] unable to care for these children."
Here, as in J.R. v. D.A.M., 615 So.2d 609 (Ala.Civ.App. 1992), the mother argues that the trial court did not give enough weight to her efforts to rehabilitate herself. We find this court's answer to that argument in J.R. applicable here:
 "The mother contends that the trial court did not consider her present situation and improvements just prior to the time of the hearing before deciding to terminate her parental rights. The record evidence discloses, however, that the mother still had not established a stable home or lifestyle, nor had she sought or obtained employment. . . . While the mother may have made some improvement, it is not necessary to prove that her prior condition was permanent in order to terminate her parental rights. The condition has been of such duration and nature as to render her unable or unwilling to care for the minimal needs of her child. D.G. v. State Department of Human Resources, 569 So.2d 400 (Ala.Civ.App. 1990)."
615 So.2d at 612.
Finally, the trial court's determination that there were no viable alternatives to *Page 133 
termination of the mother's parental rights is also supported by the record. See L.W. v. State Dep't of Human Resources,591 So.2d 872 (Ala.Civ.App. 1991). The only relative resource suggested by the mother was the maternal grandmother. The grandmother, however, refused to take the children for other than a short-term placement. R.S.'s putative father indicated his own lack of interest in obtaining custody of his son and suggested no relative of his who might be willing to take the child.
F.M., the father of F.W., asked the court to consider him as an alternative placement for both R.S. and F.W. The court's decision not to award custody of the children to F.M., however, was not plainly and palpably wrong in light of the following evidence: F.M. had an irregular employment history and neither paid child support nor maintained consistent contact with F.W.; F.M. was currently living in public housing with another woman, to whom he was not married, and that woman had two young children of her own; although there was no evidence that F.M. had been violent toward R.S. and F.W., there was evidence that he had been violent toward their mother.
F.M. suggested that his sister in Michigan or his brother in California be given custody. The court's decision not to consider the sister was reasonable in view of the fact that F.M. had provided no information to the Department about the sister and that there was no showing that the sister had expressed a willingness to take the children. The court's decision not to consider F.M.'s brother was reasonable because, aside from the fact that there was no indication that the brother was actually willing to take the children, the brother was a single man whom neither of the children had ever met.
In view of all the evidence, we conclude that the court's decision to terminate the mother's parental rights was supported by clear and convincing evidence, competent, material, and relevant in nature, and that no less drastic measures than the termination of the mother's rights would best serve the interests of the children.
The judgment of the trial court is affirmed.
AFFIRMED.
ROBERTSON, P.J., and THIGPEN, YATES, and MONROE, JJ., concur.