In February 1999, the Calhoun County Department of Human Resources ("DHR") became involved with M.H. ("the mother"), H.H. ("the daughter"), and J.A.H., the mother's husband and H.H.'s father.[1] In July 1999, DHR removed the daughter from the mother's home and placed the daughter in the home of L.D., the maternal grandmother. The maternal grandmother also had custody of the mother's son, Z.L. In February 2000, DHR placed the daughter in foster care. DHR returned the son to the mother's custody in March 2000; he was removed from her custody and placed in foster care in April. By January 2001, DHR determined that it should proceed with termination. On October 31, 2001, DHR filed its petition to *Page 1013 
terminate parental rights.[2] After a trial in April 2002, the trial court terminated the parental rights of the mother to both children.[3]
She appeals.
The mother argues that DHR failed to present clear and convincing evidence that termination of her parental rights was in the best interest of the children. She argues that DHR did not present clear and convincing evidence that her current situation warranted termination. See T.H. v.State Dep't of Human Res., 740 So.2d 1089, 1092 (Ala.Civ.App. 1998) (stating that "[a] requirement of evidence of current conditions or conduct relating to a parent's ability or willingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence"). She also argues that DHR failed to provide the necessary services to rehabilitate her once she moved from Alabama to Iowa in January 2001. After a thorough review of the record, we conclude that clear and convincing evidence supports the trial court's judgment terminating the mother's parental rights.
 "The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent's custody would be in the child's best interests, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to § 26-18-7(a), Ala. Code 1975."
Bowman v. State Dep't of Human Res., 534 So.2d 304, 305 (Ala.Civ.App. 1988) (citations omitted). The juvenile court's decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App. 1995).
To terminate parental rights, the juvenile court must first determine from clear and convincing evidence that the child or children are dependent. S.F. v. Department of Human Res., 680 So.2d 346 (Ala.Civ.App. 1996). The court must then determine that there exists no alternative to termination. L.A.G. v State Dep't of Human Res., 681 So.2d 596
(Ala.Civ.App. 1996). A court may terminate parental rights when "the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child . . . and . . . such conduct or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a).
Sections 26-18-7(a)(1) through (6) and (b)(1) through (4), Ala. Code 1975, list factors the juvenile court must consider in *Page 1014 
making the difficult decision to terminate parental rights. Among those factors are that emotional or mental illness or excessive use of alcohol or controlled substances have rendered the parent unable to meet the needs of the child, § 26-18-7-(a)(2), that reasonable efforts at rehabilitation of the parent have failed, § 26-18-7(a)(6), and that the parent has shown a lack of effort to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached with case workers. § 26-18-7(b)(4). A reading of the record indicates that the mother has a history of alcohol and drug dependency, that she has not been able to maintain steady and suitable housing, and that she has not been able to adjust her circumstances to meet the needs of her children for safety and stability.
At the time H.H. was removed from her custody, the mother was using marijuana and was unable to maintain stable living conditions. DHR provided services, including both individual and marital counseling, to the mother. Despite her attempts, the mother was unable to maintain stable housing or consistently abstain from drug use. During the trial, two of the mother's counselors, Jim Holiday and Lorna Usrey, testified concerning the mother's mental state and her drug problems.
Holiday, who had been assigned to counsel both the mother and her husband, J.A.H., as a couple, testified that the mother and J.A.H. had a pattern of marital discord and domestic violence. He commented that the mother and J.A.H. had very unstable living conditions, which he felt were somewhat rooted in their inability to meet their financial obligations. He mentioned that the mother had admitted to using marijuana and alcohol. However, Holiday, who had counseled the mother in her home in the presence of the son, noted that the mother was an attentive caretaker. According to Holiday's notes, the mother had reported to Holiday that she had a history of depression, that she had been in foster care for "a good deal of time," that she was in a residential treatment facility for two and one-half years because she had attempted to kill her sister, and that she had attempted suicide after the birth of her son. Holiday also explained why the mother and J.A.H. separated, saying that J.A.H. had reported that he permitted the mother, as a "gift," to have sexual relations with another man. According to Holiday, J.A.H. became upset with the mother when the one-night encounter became a relationship, and he separated from the mother in September 2000. After the separation, Holiday no longer counseled the mother.
Lorna Usrey counseled the mother, individually at most visits, between November 1999 and January 2001; however, according to Usrey's records, the mother did not attend any counseling sessions between August 15, 2000, and January 8, 2001. Usrey opined that the mother was very depressed, even suicidal, in November 1999. Throughout 2000, according to Usrey, the mother's depression appeared to improve and she occasionally abstained from drug use. However, at the mother's last session with Usrey in January 2001, Usrey again believed the mother to be very depressed and suicidal. Usrey described the mother as a talkative and honest patient who would discuss all problems openly. Although Usrey commented that the mother had gained "insight" into the fact that her use of drugs and alcohol was a problem, Usrey felt that the mother had not improved because she continued to use drugs. Usrey said that the mother was aware of what DHR required of her in order for her to regain custody of her children — abstaining from drug use, stable housing with utilities, continued counseling, and achieving and maintaining emotional *Page 1015 
and physical health. Usrey also said that the mother was unable to consistently meet those requirements.
Elaine Hubbard, the mother's DHR caseworker testified concerning DHR's past attempts to rehabilitate the mother and the search for alternatives to termination. Hubbard was assigned the case in late September 2001, after the decision to proceed with termination had been made. According to Hubbard, at the time she was assigned the case the mother was living in Iowa and had not provided DHR with an address or telephone number. Hubbard said she spoke with a friend of the family, who somehow contacted the mother and informed her that DHR was trying to contact her. The mother contacted Hubbard, and they discussed the most recent individualized service plan ("ISP") meeting, which the mother was unable to attend. Hubbard said that, while she was caseworker, the mother did not attempt to contact the children by telephone and sent no cards or gifts to the children.
Hubbard explained that DHR had considered K.L., the paternal grandmother, and the maternal grandmother as possible relative resources. However, according to Hubbard, they were not viable alternatives for various reasons. The home study on the paternal grandmother revealed that her expenses already exceeded her income, that she lived with her 15-year-old daughter and a man named J.H. ("the family friend") in a two-bedroom trailer. The paternal grandmother and the family friend were not romantically involved and he slept in a separate room. The paternal grandmother was not approved as a relative resource.
The maternal grandmother, who had custody of the son and the daughter at different periods during the family's involvement with DHR, had since moved to Iowa. DHR did not do a home study on her home in Iowa. However, Hubbard said that the records revealed that the maternal grandmother had returned the daughter to DHR custody because she was not financially able to support herself and the daughter. The mother later testified concerning the maternal grandmother's health, stating that her mother had had two heart attacks and had recently had surgery on her mouth. DHR did not consider the maternal grandmother, because she had returned the daughter to DHR because of her financial problems, to be a viable alternative to termination.
The mother testified. She insisted that she loved her children and that she cared for her children's needs while they were in her custody. She said she never took drugs or drank alcohol while she was in her children's presence. However, she admitted that she did use illegal drugs and that she drinks "all of the time constantly." The mother said that the daughter was removed from her home because the mother had failed a drug test. She also candidly admitted that she would fail a drug test if one were administered to her on the day of the termination trial. She said she had smoked marijuana the Saturday before the trial and indicated that she had also taken a prescription medication she called Seroquel, which she says her sister had provided her.
The mother admitted that she had been diagnosed with manic depression and bipolar disorder, that she had "alcohol syndrome," and that she had been diagnosed with other disorders during her stay in the residential treatment facility but that she did not recall the specific diagnoses. The mother said she had been prescribed Clonopin in 2001 for her nerves and that she had overdosed on the medication. The mother is illiterate and receives $363 per month in Social Security disability payments. She said she had "a nervous *Page 1016 
stroke" in November 2001 while in Alabama for another hearing concerning the termination petition. According to the mother, the doctors told her that more stress could cause her to have another stroke and that another stroke could kill her.
The family friend testified. He admitted that he was not a blood relative of the mother or of either of the children. However, he explained that he had lived with the mother and J.A.H. quite often and that he had seen the mother interact with and care for the children. He thought she was a good mother. He denied using drugs or abusing alcohol and said that the mother did not use drugs in his presence. When questioned further, he admitted that he knew that the mother did use drugs because he could smell the marijuana and because of the look in her eyes when she was "high." The family friend testified that he had exercised the paternal grandmother's visitation with the children, often without the paternal grandmother's being present. He said the previous caseworker had encouraged him and the paternal grandmother to seek placement of the children as a "group effort"; however, he said he was later informed by letter that DHR would not permit the children to live with him and the paternal grandmother because they were living together without being married.
The testimony at trial revealed that the mother loved her children. However, her continued dependence on marijuana and alcohol had not improved despite counseling and despite the fact that DHR had stressed that she would have to maintain sobriety and pass drug screens before her children would be returned to her. DHR did not perform a home study on the mother's home in Iowa; however, the mother's own testimony indicated that she had yet to establish a permanent home in Iowa, that she was currently living with her mother, and that she had lived in at least three other places in the eight months preceding the termination hearing.
Under these circumstances, DHR's decision not to request a home study does not require the conclusion that it failed to meet its burden of demonstrating that the current conditions or conduct of the mother warranted termination. See T.H., 740 So.2d at 1092. This court has explained that DHR does not have to prove that a parent's condition is permanent, only that the condition is of such duration and nature as to render the parent unwilling or unable to discharge his or her responsibilities as a parent. See T.L.W. v. State Dep't of Human Res.,678 So.2d 128, (Ala.Civ.App. 1995) (quoting J.R. v. D.A.M., 615 So.2d 609,612 (Ala.Civ.App. 1992)). By the time the mother had moved to Iowa, DHR had made the decision to seek the termination of the mother's parental rights based on the continued failure of the mother to adjust her circumstances to meet the needs of her children. One of the circumstances the mother was unable to adjust was her lack of stable housing. We cannot hold that DHR was required to perform a home study on the mother's "home" in Iowa before proceeding with its plans to terminate her parental rights.
The mother also argues that DHR failed to offer her rehabilitative services once she moved to Iowa. Although we have held that DHR is required to investigate and, if necessary, to provide rehabilitative services to a parent who resides in another state before proceeding with a termination of that parent's parental rights, see D.S.S. v. Clay CountyDepartment of Human Resources, 755 So.2d 584, 590-91 (Ala.Civ.App. 1999), we cannot agree that D.S.S. supports the mother's argument in this case. The failure of DHR to provide services to the mother upon her move to Iowa *Page 1017 
cannot be considered in isolation. In D.S.S., DHR had failed not only to offer any rehabilitative services to the father, who resided in Georgia, but also to even investigate the father's circumstances to determine if he needed those services. In the present case, DHR provided services to the mother for almost two years, during which time the mother made little and unsustained improvement. The record compels the conclusion that, despite DHR's attempts to rehabilitate her, the mother, for whatever reason, has been unable to commit to making the changes necessary to entitle her to the return of her children. Therefore, we affirm the trial court's judgment terminating the mother's parental rights because DHR's attempts to rehabilitate her have failed and because of her failure to adjust her circumstances to meet the needs of her children.
AFFIRMED.
Yates, P.J., and Thompson and Pittman, JJ., concur.
[1] The mother was married to and living with J.A.H., who was H.H.'s father. The father appealed the judgment terminating his parental rights to H.H., and this court reversed that judgment because the trial court had failed to appoint substitute counsel for J.A.H. J.A.H. v. CalhounCounty Dep't of Human Res., 846 So.2d 1093 (Ala.Civ.App. 2002). Because another hearing on the termination of J.A.H's parental rights will occur, we shall endeavor not to discuss facts concerning his conduct. However, we take judicial notice of the fact that he is currently incarcerated after having been convicted of robbery.
[2] The case was originally tried on February 7, 2002. The mother was not present at that trial. She filed a motion for a new trial, which the trial court granted. The case was retried in April.
[3] The trial court also terminated the parental rights of A.H., the father of the son. He does not appeal.