J.J. ("the mother") appeals from the Lee Juvenile Court's order of October 31, 2006, terminating her parental rights. We affirm.
 Background
The mother has long suffered from paranoid schizophrenia and anxiety and has been under outpatient psychiatric care for the last 10 to 12 years. In 1996, the mother gave birth to a son whose custody was eventually granted to the mother's aunt due to the mother's mental illness. On January 30, 2005, the mother gave birth to a daughter, A.J. ("the child"). On February 1, 2005, after having previously received a report from the mother's mental-health caseworker that the child may be in danger if the mother did not take her prescribed psychiatric medication, the Lee County Department of Human Resources ("DHR") removed the child from the mother's custody and placed the child in foster care.
On June 2, 2006, DHR filed a petition to terminate the parental rights of the mother. On September 21, 2006, and October 12, 2006, the juvenile court conducted a hearing on the petition at which it received ore tenus evidence. After that hearing, the juvenile court granted DHR's petition and terminated the mother's parental rights.[1] J.J. appealed, asserting that the evidence presented to the juvenile court was insufficient to support termination of her parental rights.
 Standard of Review
In cases in which a parent challenges the sufficiency of the evidence to support a termination of his or her parental rights, this court is required to conduct a "careful search of the record," see Moore v. State Dep't of Pensions Sec, 470 So.2d 1269, 1270 (Ala.Civ.App. 1985), to determine if clear and convincing evidence supports the judgment.Columbus v. State Dep't of Human Res., 523 So.2d 419,421 (Ala.Civ.App. 1987); see also L.M. v. D.D.F.,840 So.2d 171, 179 (Ala.Civ.App. 2002) ("Due to the serious nature of the action of terminating a parent's parental rights, this court must carefully review the unique set of facts established in each case in determining whether clear and convincing evidence was presented to support the termination of those rights."); Santosky v. Kramer, 455 U.S. 745,102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that due process allows parental rights to be terminated only upon clear and convincing evidence of unfitness); and Ala. Code 1975, § 26-18-7(a) (requiring clear and convincing evidence to support an order terminating parental rights). "`"[C]lear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'"Ex parte T.V., 971 So.2d 1, 9 (Ala. 2007) (quotingL.M. v. D.D.F., 840 So.2d at 179, citing, in turn, Ala. Code 1975, § 6-11-20(b)(4)).
 Applicable Law
Section 26-18-7(a), Ala. Code 1975, a part of the 1984 Child Protection Act ("the *Page 826 
CPA"), § 26-18-1 et seq., Ala. Code 1975, sets forth the law regarding termination of parental rights. That section provides:
 "If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 ". . . .
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child."
In addition, in cases in which a child is not in the physical custody of the parent, the CPA also requires the juvenile court to consider:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
§ 26-18-7(b), Ala. Code 1975.
The CPA declares in two places that in deciding whether either of the statutory grounds for termination of parental rights has been established the juvenile court is not limited to consideration of the statutory factors set about above. See Ala. Code 1975, § 26-18-7(a) ("the court shall consider, . . . but not be limited to, the following. . . ."); seealso § 26-18-7(b). Accordingly, a juvenile court may consider other factors bearing on the question of whether or not grounds for termination of parental rights exist.See Brown v. Alabama Dep't of Pensions Sec,473 So.2d 533 (Ala.Civ.App. 1985).
Our supreme court has declared that before a juvenile court may terminate parental rights, it must conclude that there is no other viable alternative to termination. Ex parte T.V.,supra. In many cases, DHR has a duty to use reasonable efforts to rehabilitate the parents so as to remove any obstacles to family reunification. See Ala. Code 1975, § 12-15-65(g)(2) and -65(m); Miller v. Alabama Dep't ofPensions Sec, 374 So.2d 1370 (Ala.Civ.App. 1979). In addition, Ala. Code 1975, § 12-15-71(a), lists several alternatives to termination of parental rights, allowing a trial court to make any of the following orders affecting the custody of the child:
 "(1) Permit the child to remain with the parents, guardian, or other custodian of the child, subject to conditions and limitations as the court may prescribe. *Page 827 
 "(2) Place the child under protective supervision as herein provided or under the supervision of the Department of Human Resources.
 "(3) Transfer legal custody to any of the following:
 "a. The Department of Human Resources; provided, that the department is equipped to care for the child.
 "b. A local public child-placing agency or private organization or facility willing and able to assume the education, care, and maintenance of the child and which is licensed by the Department of Human Resources or otherwise authorized by law to receive and provide care for the child.
 "c. A relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child.
 "(4) Make any other order as the court in its discretion shall deem to be for the welfare and best interests of the child."
See Hunley v. Houston County Dep't of Pensions Sec, 365 So.2d 81, 84 n. 1 (Ala.Civ.App. 1978); andMiller v. Alabama Dep't of Pensions Sec., supra.A trial court may terminate parental rights when clear and convincing evidence proves that those alternatives are not viable. Ex parte T.V., supra.
 Evidence Presented at the Termination Hearing
The evidence presented at the termination hearing established that the mother, who was 42 years old at the time of the termination hearing, has lived for many years on her own in a suitably furnished and clean apartment with subsidized rent. The mother does not hold a job but maintains herself with Social Security disability benefits amounting to $623 per month. A caseworker from the East Alabama Mental Health Center monitors the mother and sometimes provides the mother with transportation to pick up groceries. However, the mother handles her own finances, cleaning, cooking, and other ordinary activities of daily living. The caseworker mainly ensures that the mother complies with her medication schedule. The caseworker testified at trial that the mother ordinarily complies with her medication schedule, except when the medication causes her physical side effects.
During her pregnancy the mother ceased taking her psychiatric medication out of concern for its effects on the child. As a result, the Lee County Probate Court twice committed the mother to a psychiatric hospital — in August and October 2004, respectively. After the mother gave birth to the child, she became compliant with her medications and remained compliant both with her medications and with her therapy appointments up to the time of the termination hearing.
Despite the mother's compliance with her medication regimen, she continued to exhibit unusual behavior and beliefs. She testified that she gave birth to children from the time she was three years old. According to the mother, in 1996, she gave birth to a son at home who was taken from her by unknown persons; she claimed that the next day she had a second son who came out of her afterbirth. According to the mother, it was this second son that now resided with her aunt. The mother still asked about the whereabouts of the phantom first son. When she became pregnant in 2004, the mother again believed that she was having twins, and at the termination hearing she maintained that one of the unborn twins remained inside her despite obstetrical testing establishing otherwise. *Page 828 
The mother testified that when she was a little girl someone tied her to a chair while she was sleeping; that she awoke when she heard a baby crying out her name; that she untied herself, looked in a mirror, and noticed her eyes had turned blue; that she went to the oven from where the baby's cries were coming and saw that the baby's eyes were also blue; and that the baby was burned. The mother recalled the police questioning her about the baby; she testified that she had admitted putting the baby in the oven, although the mother indicated that she had not actually done it.[2]
The mother also testified that when she was pregnant with the child she saw a big snake outside her window. Believing that snakes thrived off human breast milk, she got a knife and tried to make a spear out of a broomstick. According to the mother, the property manager at her apartment falsely accused the mother of trying to stab someone named Sue Ann with the knife. In addition, the mother testified that she sometimes sees colorful spirits. She also called the police one time to report blood dripping from her ceiling. Their investigation yielded nothing. Several witnesses testified that the mother had reported seeing a creature appearing to be half-man and half-wolf in her apartment. Witnesses also testified that the mother has reported at various times that worms were eating her flesh; that someone was playing tic-tac-toe on her head; and that people were dying in the apartment upstairs from the mother's apartment.
While the child was in the custody of foster parents, the mother expressed concerns that the child was being sexually molested because of the way the child appeared and acted, although the child appeared and acted normally. The mother even telephoned the police twice to report her concerns as well as her belief that a security guard had struck the child on the head; the mother also reported that the foster parents were not properly feeding the child.[3] The mother testified that she felt the child was in danger because many people hated the mother and that those people might hurt the child as a way to harm the mother.
The mother did not receive any rehabilitation services from DHR. A DHR case-worker testified that DHR knew that the mother was receiving state-sponsored mental-health treatment but that DHR never planned to offer the mother any additional services. DHR has always maintained the position that the child could never be safely reunified with the mother and that any other rehabilitative services were futile.
A DHR caseworker testified that the mother visited the child once a week under the supervision of DHR employees. The mother never missed a visit and always seemed eager to spend time with the child. Overall, the mother acted appropriately during those visits and never neglected the child. During those visits, the mother fed the child, changed her diapers, and played with the child. None of the visits were ever terminated prematurely due to the mother's behavior. However, on one occasion, the mother, when disciplining the child, stated that she would slit the child's throat and cut its head off. The mother immediately laughed afterwards and said she would not actually do those things to the child. The remark concerned the case-worker, although the caseworker testified *Page 829 
that she believed the then one-year-old child could not understand the mother. The mother also seemed fixated on the child's genital area and her concern that the child may have been subjected to sexual abuse. The mother stated that she wanted to breastfeed the child so that she could change its skin from black to white. The mother also regularly commented that the child looked sad, that the child did not love the mother, and that the foster parents were not adequately feeding the child. The mother never actually physically harmed the child or exhibited behavior that any witness believed could affect the child emotionally or mentally during her visits.
At the hearing, one of the mother's mental-health caseworkers testified that, based on her four years of observing the mother in a home environment, the mother was capable of caring for the child so long as she received assistance from mental-health workers and DHR. Another of the mother's mental-health caseworkers, who had known the mother since 1997, testified that the mother had never intentionally harmed herself or others and that the mother could care for the child so long as she had supervision. The mother's psychiatrist and the mother's therapist testified that the mother was as mentally stable as she would ever be and that the mother had never intentionally tried to harm herself or others. However, the psychiatrist would not rule out the possibility that the mother could harm the child while under a delusional state. The psychiatrist opined that the mother would only be capable of caring for the child if she were provided 24-hour-a-day supervision by a person who would perform the majority of the parental duties. The psychiatrist also recommended that the mother be allowed to maintain visitation with the child in order to avoid any further deterioration in her mental status.[4]
DHR attempted to locate relatives to take custody of the child. The mother's aunt who had taken custody of the mother's son declined to take the child. The mother's brother occasionally expressed interest in taking the child, but he basically admitted his interest was based on pressure from the family to help out. Ultimately, the brother did not follow through with DHR's attempt to perform a home study on his house. The brother also admitted that he had no parenting skills and that he would have to rely on others to properly care for the child. The mother objected to her brother's being considered as the child's legal custodian for this latter reason.
 Grounds for Termination
The evidence presented at the termination hearing unequivocally established that the mother suffers from a serious and chronic mental illness that is unlikely to change in the foreseeable future, even with continued treatment. The mother's mental illness makes it difficult for the mother to distinguish reality from fiction. The mother's psychiatrist testified that the mother could harm the child while in a distorted mental state, even though she had never harmed anyone in the past. All of the mother's mental-health experts testified that the mother could not independently care for the child; they all agreed that she could care for the child only with constant supervision.
In Muffoletto v. State Department of Human Resources,537 So.2d 939 *Page 830 
(Ala.Civ.App. 1988), this court affirmed a judgment terminating the parental rights of a mother who suffered from chronic schizophrenia and Tourette's syndrome. Medication controlled the mother's condition to the point that she could live alone, but she required numerous hospitalizations after the child's birth. Efforts to reunify the mother with the child failed due to those repeated hospitalizations. This court sympathized with the mother because, due to circumstances beyond her control, she could not safely assume custody of her child. The court nevertheless held that the record contained clear and convincing evidence that the mother's mental illness rendered her incapable of caring for her child.
In Thornton v. Thornton, 519 So.2d 960
(Ala.Civ.App. 1987), this court upheld a judgment terminating the parental rights of a mother who had shot and killed the child's four-year-old sibling while suffering from a violent episode of chronic schizophrenia. The mother's psychiatrist testified that the mother's mental condition was in remission but that he could not guarantee that the mother would not have another violent episode even while taking her psychotropic medication. The psychiatrist also testified that a violent episode was likely if the mother quit taking her medication.
In T.L.W. v. State Department of Human Resources,678 So.2d 128 (Ala.Civ.App. 1995), a mental-health expert testified that the mother suffered from major depression, addictive disease problems, and a personality disorder that made it unlikely that she would ever be able to adequately care for her children. This court noted that the mother obviously loved her children and that they loved her. Nevertheless, this court held that clear and convincing evidence supported the trial court's judgment determining that the mother was unable to discharge her responsibilities to and for her children, that her mental condition rendered her unable to properly care for her children, and that the mother's condition was unlikely to change in the foreseeable future.
Although the cases cited above are not directly on point with this case, the legal principles applied in those cases lead us to conclude that grounds for termination of parental rights exist when a parent, due to a severe and prolonged mental illness, cannot safely and consistently perform ordinary parental responsibilities without constant and significant assistance from and supervision by state agencies. As this court stated in T.L.W.:
 "`[A]lthough it appears that the mother is genuine in her love and concern for her child, it appears . . . that her limitations are so severe that she [is] unable to care for the child.'"
678 So.2d at 132 (quoting G.L. v. State Dep't of HumanRes., 646 So.2d 81, 84 (Ala.Civ.App. 1994)).
At trial, and again in her briefs to this court, the mother emphasized that she complied with every request by DHR and that she never missed a single visit with the child. However, the CPA requires only that the juvenile court must consider those factors when deciding the ultimate question of whether the parent is unable or unwilling to discharge parental responsibilities to and for the child. See Ala. Code 1975, § 26-18-7(a). The mere fact that a parent has satisfied one or more of those factors is not determinative of whether a parent is able to discharge his or her responsibilities to and for the child; that fact does not prevent the trial court from finding grounds for termination of parental rights when clear and convincing evidence shows that the parent's mental illness prevents proper care of the child. *Page 831 
In this case, out of love for her child, the mother no doubt did everything within her power to gain custody of the child, including complying with all of DHR's requests and consistently visiting the child. Nevertheless, clear and convincing evidence established that it was not within her power to overcome her mental problem to the point that she could properly care for the child. Therefore, the juvenile court did not err in finding grounds for termination of the mother's parental rights.
 Lack of Viable Alternatives
The mother next argues that the juvenile court erred in failing to consider viable alternatives to termination of her parental rights. The mother initially argues that DHR did not make any effort to reunify her with the child. The mother also contends that the juvenile court should have awarded her custody with DHR's supervision, as recommended by the mental-health experts.[5] DHR counters that it had no duty to attempt to reunify the mother with the child, citing D.W. v. StateDepartment of Human Resources, 595 So.2d 502
(Ala.Civ.App. 1992). DHR also asserts that granting the mother custody with supervision by DHR was not a viable alternative in this case.
In D.W., supra, a father argued that the juvenile court had erred by terminating his parental rights due to his mental illness. The father asserted that DHR had a duty to rehabilitate him and that it had made no effort, such as arranging parenting classes for him, to do so. The caseworker testified that DHR made no effort to rehabilitate the father because his mental illness — chronic schizophrenia that sometimes provoked violent psychotic episodes — was so severe that any rehabilitation effort would have been futile. The court held that DHR had no duty to rehabilitate the father, stating:
 "A child may be found to be dependent based on the mental illness or mental deficiency of a parent, if the disorder renders the parent unable to take care of the child and is unlikely to change in the foreseeable future. If such a finding is made, there is no requirement that rehabilitation be attempted before the parental rights may be terminated. Matter of Hutchins, 474 So.2d 1152 (Ala.Civ.App. 1985)."
595 So.2d at 504.
In In re Hutchins, 474 So.2d 1152 (Ala.Civ.App. 1985), this court held that DHR's duty to use reasonable efforts to rehabilitate a parent arose from § 26-18-7(a)(6), Ala. Code 1975. That section applies when DHR petitions to terminate parental rights based on a parent's inability or unwillingness to discharge his or her parental responsibilities to the child. However, if the juvenile court properly concludes that the parent suffers from a condition, such as a mental illness, that renders the parent unable to properly care for the child, and that such condition is unlikely to change in the foreseeable future, § 26-18-7(a)(6) is inapplicable and DHR has no duty to use *Page 832 
reasonable efforts to rehabilitate the parent.
We conclude that DHR's reliance on D.W. andHutchins is misplaced. D.W. was decided in 1992 and, since that time, the legislature has amended the juvenile code. As a result, the duty to rehabilitate a parent does not arise exclusively from § 26-18-7(a)(6), if it ever did. Rather, Ala. Code 1975, § 12-15-1.1(3), establishes a goal for the juvenile courts of this state "[t]o reunite a child with his or her parents as quickly and as safely as possible when the child has been removed from the custody of his or her parents." Alabama Code 1975, § 12-15-65(g), provides that a juvenile court, when entering an order continuing the placement of a child outside of his or her home, must make specific findings that reasonable efforts have been made to reunite the child with his or her family, or that such reasonable efforts have failed. The duty to reunify the child with the child's parents includes the duty to rehabilitate the parents if such rehabilitation can help achieve the ultimate goal of reunification. See J.B. v. Jefferson County Dep'tof Human Res., 869 So.2d 475 (Ala.Civ.App. 2003). Hence,Hutchins, which D.W. relied upon, is no longer an accurate statement of the law. As the law now stands, DHR has a duty to use reasonable efforts to rehabilitate a parent in every case in which reunification is practicable.J.B., 869 So.2d at 481.
Despite its misplaced reliance on D.W., DHR correctly argues that it had no duty to attempt rehabilitation based on the facts of this particular case. Section 12-15-65(g) requires DHR to use "reasonable" efforts to reunify the child with his or her parents. Obviously, any effort at rehabilitation would only be reasonable if such effort, if successful, could remove the obstacle to family reunification.
In this case, the mother's chronic schizophrenia is incurable and, according to her psychiatrist, no known treatment can effectively control her condition so that the mother can assume proper care of the child. Accordingly, DHR could not have undertaken any effort that would have allowed the child to safely reunify with the mother. See Ala. Code 1975, § 12-15-65(m) ("In determining the reasonable efforts to be made with respect to a child, and in making such reasonable efforts, the child's health and safety shall be the paramount concern."). In short, rehabilitation of the mother was not a viable alternative to termination of her parental rights in this case. Therefore, the juvenile court did not err in failing to order DHR to arrange for parenting classes, to conduct a home study of the mother's apartment, or to pursue other rehabilitation efforts.
The juvenile court also did not commit reversible error by failing to grant the mother custody with DHR supervision. Although § 12-15-71(a)(1) and (a)(2) grant the juvenile court the option of placing the child with the parent with DHR supervision, the juvenile court is not required to do so when clear and convincing evidence proves that such an alternative is not viable. In this case, the juvenile court had before it clear and convincing evidence that the mother could only parent the child with constant supervision by persons trained in proper parenting techniques. Undisputed evidence proved that DHR did not have the resources to employ a person 24 hours a day to supervise and to guide the mother's interaction with the child. Clear and convincing evidence also established that DHR attempted without success to find a suitable custodian for the child within the mother's family. Therefore, clear and convincing evidence sustains the juvenile court's implicit finding that placement of the child with the mother *Page 833 
with DHR supervision on a permanent basis was not a viable alternative to termination of the mother's parental rights.
For these reasons, we affirm the termination of the mother's parental rights.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur in the result, without writing.
[1] The parental rights of the child's unknown father, who the mother could not or would not identify, were also terminated by the juvenile court. Before the termination hearing, DHR published notice of the hearing and checked the Putative Father Registry. No one responded to the publication notice and DHR found no registrant claiming to be the father of the child at issue in this case. The father's parental rights are not at issue in this appeal.
[2] The record indicates that the mother merely imagined this event.
[3] The evidence was undisputed that the child was gaining weight normally and was being routinely checked by a pediatrician.
[4] The mother's mental-health records were produced at the termination hearing; those records documented that the mother constantly voiced concern and distress over the loss of custody of her child.
[5] The mother does not argue that the juvenile court erred by failing to consider granting the foster parents permanent custody and allowing her supervised visitation. See D.C. v.J.C., 842 So.2d 17 (Ala.Civ.App. 2002); D.M.P. v. StateDep't of Human Res., 871 So.2d 77, 95 n. 17 (Ala.Civ.App. 2003); and W.L.H. v. B.L.M.,829 So.2d 173, 175 (Ala.Civ.App. 2002) (Murdock, J., concurring specially). Hence, we cannot address whether the juvenile court erred in failing to consider that alternative. See Asam v.Devereaux, 686 So.2d 1222 (Ala.Civ.App. 1996). However, we note that, although the mother no longer has a legal right to visitation with the child, nothing in the law prevents the foster parents or adoptive parents from allowing the mother supervised visitation with her child so as to preserve some sort of bond with the mother if the foster parents or adoptive parents agree.