In July 2002, the Calhoun County Department of Human Resources ("DHR") received a child-neglect report indicating that A.P. and J.T.P. IV were living in filth and that their mother, R.P. ("the mother"), was pregnant and drank alcoholic beverages. DHR sent Shirley Jennings to investigate the report. According to Jennings, the conditions at the house where the children were living were unsanitary and unsafe. The house was home to the children, the mother, J.T.P. Ill ("the father"), the father's mother, the father's brother, and another unrelated adult. The floors of the house were littered with trash, empty beverage containers, and cigarette butts. Both of the children, who were two and a half years old and one year old, respectively, were dirty and were wearing a shirt for a diaper with a plastic discount-store bag over it. The shirts were saturated with urine. The children had an odor, and they were infested with head lice so badly that the lice could be seen crawling in their hair. DHR removed the children that day and placed them in foster care. When the parents' third child, N.P., was born on October 28, 2002, DHR did not immediately remove him from the home. He remained with the parents until September 2004, when he was removed because he had head lice.
DHR began providing services to the family in 2002, after the first two children were removed; primarily, DHR focused on teaching daily living skills, parenting skills, and personal hygiene. DHR also required that the father secure and maintain employment and that the parents find a home of their own as soon as they were able. The parents had visits from in-home workers who assisted the mother with learning the skills to keep a clean and orderly home and with understanding why she needed those skills. After several moves necessitated by the parents' financial instability, the parents finally settled into a home of their own. The father attempted a few employment ventures with little success; he eventually became employed by a steel manufacturer, and he had maintained that employment for nearly two years at the time of trial. He works 12-hour shifts 6 days a week; his shifts are from 3:00 p.m. to 3:00 a.m. The mother is not employed.
For a time, the parents had unsupervised visitation with the children on week-ends. They also received an extended visit over the Christmas holiday weekend in 2004. The children returned from the visit with head lice; apparently certain extended family members who had head lice visited the parents and children during the holiday. DHR filed petitions to terminate the parents' parental rights in February 2005; however, those petitions were placed on the administrative docket at DHR's request.
The children were returned to the parents on April 27, 2005, in a "last-ditch" effort to reunite the family. On May 2, 2005, the guardian ad litem for the children made an unannounced visit to the family's home in the early evening, around dinner time. According to the guardian ad litem, the house was "in bad shape," with dried food and pots and pans littering the kitchen, crumbs on the floor in the house where the children had eaten snacks like cookies, and dirty diapers on the floor. She also reported that the children were dirty and that the younger children's diapers needed changing. The guardian ad litem surveyed the entire house, noting that the parents' room was "chaos," with clothing strewn everywhere and in such a *Page 79 
way as to make it impossible to determine clean items from dirty ones. She moved to have the children removed from the home again; the juvenile court granted her motion on May 10, 2005, without a hearing and ordered DHR to remove the children. DHR moved to set aside the juvenile court's order; the juvenile court denied that motion. The parents also moved to set aside the juvenile court's removal order; the record does not reflect whether the juvenile court addressed that motion. On June 6, 2005, DHR filed a certificate of readiness in which it requested that the pending petitions for termination of the parental rights of both parents be moved from the administrative docket to the active docket and be set for trial.
At the trial, the testimony revealed that the parents had had the most difficulty in keeping a clean house. DHR caseworkers and DHR contract workers from other agencies like Family Values and Family Options provided in-home services to assist the mother in learning to maintain her house; however, all of those workers indicated that the mother did not seem interested in keeping the house clean and that the mother could perform tasks if instructed to do them and reminded to perform them. Notably, at least three workers testified that if S.G., the children's maternal grandmother, was present, the house was appropriately clean and the children were suitably dressed and clean.
In addition to the aforementioned head-lice problems, which the parents appeared to have under control in their own home, the parents had had an insect-infestation problem at each place they had lived. The testimony revealed that, at times, the insects were nesting under the tray of the youngest child's high chair, which was being used. Most of the workers testified that the mother's proclivity to leave food out and her lack of housekeeping skills contributed to the infestations.
Angela Davis, an independent counselor at Counseling Associates, provided counseling to the parents two times during the pendency of the case. She first counseled the family when the children first came into foster care in 2002, when Davis was working with another counseling agency. At that time, Davis addressed with the parents the issues of adequate housing, stable employment, and having enough food in the house for the children. She said that the father did get a job and that the parents moved into their own home during that first counseling relationship. In 2004, Davis began counseling the parents for a second time. She said that she addressed job maintenance, the continued need to maintain adequate housing, parenting skills, and personal-hygiene issues during the second counseling relationship. She testified that the skills she had addressed in 2002 had not been adequately applied, but she noted that she saw improvement once the second counseling relationship began. Davis noted that the parents' decision-making skills are poor, especially in regard to the mother's choice to spend a significant sum of the parties' income-tax refund on the purchase of a dog. Davis also commented that the parents often appeared to have "rolled out of bed" to get to the counseling appointments. According to Davis, the parents would likely not be able to maintain a clean house without someone present consistently to guide the mother to the tasks that needed to be done.
Other workers who assisted the parents also voiced their opinion or concern that the mother would need help maintaining a clean house. At least one worker indicated that she was not certain that the mother had the ability to learn what needed to be *Page 80 
done and to apply it on her own without assistance.
The mother's psychological evaluation revealed that she had limited cognitive abilities; Dr. Samuel Fleming described her as having borderline to low average intelligence. The mother's possible diagnoses, based on her personality testing, included borderline personality disorder and schizoaffective disorder. Dr. Fleming noted that people with the mother's personality profile tend to be seen as indecisive, perplexed, and even hostile and irritable. Notably, Dr. Fleming commented that the mother was likely distractible, would "disorganize" under stress, and would perform only fairly at achieving goals set for her. Dr. Fleming recommended that the mother seek mental-health counseling. The mother did seek counseling as recommended, but when she reported to the father that she would need several six-to eight-hour sessions at $15.00 per hour, he told her that they could not afford the counseling. Although DHR presented evidence indicating that the mother was incorrect about being required to attend six-to eight-hour counseling sessions, the father testified that he had called the mental-health center and was told that the mother would need to be observed more than once for an extended period of time. According to the father, he could not see how he could afford to pay $5.00 more than he earned per hour for six to eight hours of mental-health counseling. The father indicated a willingness to support mental-health counseling for the mother if it was affordable or if they were to receive assistance with the cost. He also noted that he needed assistance with transporting the mother to and from counseling, because he needed to sleep some during the day and the mother did not have a drivers' license. DHR did not indicate that it had offered transportation or financial assistance to the mother in an effort to get her the mental-health counseling it desired her to receive.
 "The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent's custody would be in the child's best interests, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to § 26-18-7(a), Ala. Code 1975,. . . ."
Bowman v. State Dep't of Human Res., 534 So.2d 304,305 (Ala.Civ.App. 1988) (citations omitted).
A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights. Exparte Beasley, 564 So.2d 950, 954 (Ala. 1990). As the supreme court has explained, "[f]irst, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7." Ex parte Beasley, 564 So.2d at 954. In those cases where the state (or any other nonparent) is a petitioning party, the petitioner must also show that the child is dependent. Id. After the court has determined that grounds for termination exist, *Page 81 
"the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered."Id.; see D.M.P. v. State Dep't of Human Res.,871 So.2d 77, 85-95 (Ala.Civ.App. 2003) (discussing the application of the "viable alternative" prong of the Ex parteBeasley test).
The statutory grounds upon which a juvenile court may terminate parental rights are set out in Ala. Code 1975, §26-18-7. In part, the statute provides that termination of parental rights is an option when "the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child . . . and such conduct or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a). A juvenile court's decision to terminate parental rights that is based on evidence presented ore tenus is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep't ofHuman Res., 669 So.2d 187 (Ala.Civ.App. 1995).
A court may terminate parental rights when "the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child . . . and such conduct or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a). Sections 26-18-7(a)(1)-(6) and (b)(1)-(4) list factors a juvenile court must consider in making the difficult decision to terminate parental rights. Among those factors are that efforts by DHR to rehabilitate the parents have failed, § 26-18-7(a)(6), and, when the child is no longer in the custody of the parents, the "[l]ack of effort by the parent[s] to adjust [their] circumstances to meet the needs of the child in accordance with agreements reached . . . with [DHR]." § 26-18-7(b)(4).
The mother and the father do not argue that DHR did not establish grounds for termination. Instead, they argue that DHR failed to prove that there existed no viable alternatives to termination in the present case. They argue that the children's maternal grandmother was a viable alternative in the present case and that DHR failed to pursue a home study to determine if she could assume custody of the children. In addition, during the maternal grandmother's testimony, she offered to assist the mother on a daily basis if the children were allowed to remain in the parents' custody. We have held that DHR has a duty to investigate the current circumstances of possible relative resources, V.M. v. State Department of HumanResources, 710 So.2d 915, 921 (Ala.Civ.App. 1998), and we also noted in V.M. that "the grandmother's availability and willingness to help provided another viable alternative to termination."
The parents point out that on May 12, 2005, DHR filed a motion to set aside the juvenile court's order requiring that the children be removed from the parents' custody. The parents also filed a motion to set aside the juvenile court's order. As an exhibit to the parents' motion, they attached a letter dated May 9, 2005, from Larry Shirley, a caseworker assigned to the case, in which he explained that the parents had cleaned up their house after the May 2 visit from the guardian ad litem and that they had made a plan for keeping the house clean with the assistance of the Family Options and Family Values in-home counselors; Shirley noted that the schedule appeared to be working. In addition, that letter notes that the maternal grandmother had agreed to assist the mother on a regular basis. Shirley noted that part of the problem the parents had encountered after having the children returned to them was the mother's reluctance to ask her family for help for fear *Page 82 
that it would reflect poorly on her own skills. Shirley noted in his letter that he had since explained to the mother that seeking assistance from family members was an appropriate response when she felt overwhelmed. Shirley also commented specifically that the maternal grandmother had indicated that she would help the mother on a regular basis and that the maternal grandmother's influence was a positive one that DHR felt would assist the mother in learning positive parenting skills. Most importantly, however, Shirley's letter noted that the reunification of this family had resulted in strong familial bonds between the children and the parents; the letter read:
 "The family appeared to be closely bonded with one another. They interacted naturally with one another and the children seemed excited to have company. They proudly showed off their own rooms."
There was also evidence indicating that the family was maintaining progress in keeping the house maintained after the children were removed on May 2, 2005. Shaketa Wallace, a support worker from Family Values, had been regularly visiting the home since May 2005. She said that she transports the children to the parents' home for visitation. Her testimony supports Shirley's comment that the schedule instituted to keep the house clean appeared to be working. Wallace stated that if the maternal grandmother was at the house, the house was clean. If the maternal grandmother was not there, Wallace commented that the house was not "too messy." She did note that, on occasion, "sippy" cups or some food and dishes from the night before may still be out in the kitchen or that grocery bags might be on the floor. She noted that she had seen a few bugs on her visits but not enough to cause concern about an infestation.
DHR argues that, during the years the children have been in foster care, the parents have proven that they cannot maintain a clean house. DHR also argues that it investigated and rejected the relatives that the mother had previously suggested as potential resources. DHR specifically points out that the mother never gave the name of the maternal grandmother as a relative resource and that the maternal grandmother never stated on the stand that she wanted to be considered for placement. In any event, DHR states in its brief on appeal that it would reject the maternal grandmother as a placement resource because of her medical conditions, the fact that she has had unstable living patterns in the past, and because she now has her son, his wife, and their infant child living with her (albeit, according to the maternal grandmother, on a temporary basis because the basement of their house had been flooded and was unlivable during the repairs). Thus, DHR contends, no viable alternative to termination exists in the present case.
However, DHR's position on the reunification of this family took an abrupt turn between May 12, 2005, and June 6, 2005, for a reason not apparent from the record. Shirley's May 9 letter makes it clear that DHR was supportive of the family's reunification, understood that the May 2 incident was not completely indicative of the family's ability to properly maintain the house, and was in favor of the continued daily involvement of the maternal grandmother as a positive influence, helpful assistant, and role model for the mother. In fact, the May 9 letter itself contains one viable alternative to terminating the parental rights of this mother and father — to utilize the maternal grandmother to assist the mother and to teach her appropriate housekeeping and parenting skills. The mother may not have the ability to learn *Page 83 
and implement all the necessary skills to parent the children and maintain the house alone during the day; however, with the assistance of the maternal grandmother, the mother is able to maintain the house and properly care for the children. In addition, DHR could provide financial assistance and transportation to any necessary mental-health counseling for the mother, which could assist the mother in becoming a better parent and in improving her basic living skills.
As noted above, the mother had finally been encouraged to seek the help of her family, despite the mother's obvious confusion about using her family as a resource in light of DHR's earlier insistence that the parents get their own place with no other people, be they related or not, living with them. The mother's housekeeping skills had become better, although they were not perfect. The parents had made strides since the May 2 incident, and they love their children and the children love them. Although the parents had lived in disturbingly filthy conditions at the time of the older children's removal and at other times since the older children's removal have had issues with cleanliness and hygiene, they had finally managed to make the appropriate adjustments in their circumstances when DHR abruptly decided to go forward with termination proceedings. Had DHR proceeded with termination proceedings months earlier, when the parents were still having trouble with lice and insect infestations and had not yet been able to implement the skills they were being taught by the in-home workers, termination of their parental rights may well have been warranted. However, the evidence in this case demonstrates that the parents are finally making sufficient progress. At least one potential viable alternative to termination is available in the present case. As the plurality opinion inD.M.P. explained, a juvenile court faced with a case in which the grounds for termination exist but in which a viable alternative to termination is available must consider whether the termination of the parents' rights is in the children's best interests. D.M.P., 871 So.2d at 95. Therefore, we reverse the judgment of the juvenile court terminating the parents' parental rights and remand the cause to the juvenile court to consider whether, in light of the potential viable alternative available in the present case, i.e., the assistance of the maternal grandmother, termination of the parents' parental rights is in the best interests of these children.
REVERSED AND REMANDED WITH INSTRUCTIONS.
MURDOCK, J., concurs.
THOMPSON, PITTMAN, and BRYAN, JJ., concur in the result, without writing.