983 So.2d 1108 (2007)
K.N.F.G.
v.
LEE COUNTY DEPARTMENT OF HUMAN RESOURCES.
2060355.
Court of Civil Appeals of Alabama.
August 3, 2007.
*1110 Melissa S. Gowan of Walter Northcutt & Associates, Auburn, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Elizabeth L. Hendrix, asst. attys. gen., Department of Human Resources, for appellee.
THOMAS, Judge.
On May 17, 2005, the Juvenile Court of Lee County determined that the two minor children of K.N.F.G. ("the mother")  H.D., her three-year-old daughter, and A.L., her two-year-old son  were dependent. Subsequently, on July 20, 2006, the Lee County Department of Human Resources ("DHR") filed a petition to terminate the parental rights of the mother; the unknown father of H.D.; and B.L., the alleged father of A.L. Following an ore tenus proceeding on December 11, 2006, the juvenile court terminated the parties' parental rights pursuant to § 26-18-7, Ala. Code 1975.
The mother timely appeals, alleging that the juvenile court erred in terminating her parental rights because: (1) there was not clear and convincing evidence that the children were dependent, and (2) the juvenile court failed to properly consider viable alternatives to termination of her parental rights.[1]
Laura Terrell, a foster-care worker for DHR who handled the mother's case, asserted that DHR became involved in this case due to allegations of neglect. The report containing those allegations stated that the mother's home was filthy and had no running water, that the children went without a bath unless a neighbor bathed them, that the children had head lice, and that H.D. had a severe rash. Upon investigation of the report, DHR found both children playing unsupervised in the mother's yard among broken glass and other dangerous materials. DHR's investigation also found that the mother's home was indeed filthy, that the children were suffering from neglect, and that the children were without health or medical insurance through Medicaid or any other provider. Therefore, DHR implemented a safety plan whereby temporary custody of the children was given to a neighboring family.
The children were then taken for medical examinations, and both children were diagnosed with head lice. It was also determined that the older child, H.D., had body lice and mites. H.D. was also diagnosed with venereal warts, a sexually transmitted disease.
The mother testified that she had thought the disease was diaper rash, but she admitted that, after taking H.D. to the hospital to get her checked out, a doctor had indicated that H.D. might have warts and that she should take H.D. to a gynecologist. The mother claimed that she had missed her appointment date with a gynecologist and had tried to reschedule but did not hear back from the office. However, she admitted that between the time of the missed appointment and the time when DHR implemented the safety plan for the children, which was almost a year, she had never again attempted to take H.D. to a gynecologist.
*1111 The mother testified that she later questioned whether her ex-boyfriend, B.L., had given the child the disease because, she claimed, towards the end of their relationship she had found him with a prostitute and shortly thereafter saw that warts had developed on his genitalia. Terrell testified that B.L. denied transmitting the disease to H.D.[2]
At the time of the termination hearing, H.D.'s venereal warts were an ongoing problem requiring monthly appointments with a dermatologist for treatment. H.D. had also undergone surgery at Children's Hospital South in Birmingham to remove the warts because the outbreaks were excessive. Another surgery was scheduled in the near future.
Additionally, H.D. had a vision problem that caused one of her eyes to turn outward (i.e., a "lazy eye"), and she had been diagnosed as being extremely nearsighted and had been prescribed glasses.
Approximately a month after beginning their stay with the neighboring family, the children were transferred into foster care because the neighboring family became unable to care for the children. The foster mother assigned to the children runs a day-care center in Columbus, Georgia, and is a registered nurse.
On July 7, 2005, the juvenile court conducted a full hearing and determined that the children were dependent due to neglect. The dependency order required, among other things, that the mother pay $20 per week in child support per child, obtain her driver's license, obtain gainful employment and housing, and have a home evaluation done on her home. The order also provided that visitation with the children take place according to DHR guidelines. The children remained under the care of the foster mother until the time of the termination hearing.[3]
The testimony at the termination hearing revealed that, soon after the children's removal from the mother's custody, the mother was evicted from the rented trailer in which she and the children, along with K.N.F.G.'s mother and sister, were living and was forced to move into a homeless shelter in Columbus, Georgia. In July 2005, the mother moved in with her grandmother for a short period of time, and soon thereafter, in August 2005, she moved into a low-income housing unit in Columbus.
After moving in to the housing unit, DHR initiated a home evaluation to be done pursuant to the Interstate Compact for the Placement of Children ("ICPC"), see § 44-2-20 et seq., Ala.Code 1975, and Ga.Code Ann. § 39-4-4 et seq., and through the Muscogee County Department of Family and Children Services ("DFCS") in Georgia. The home-evaluation process began on or about November 29, 2005. Susan Reames, the caseworker for DFCS who had been in charge of the mother's home evaluation, testified that, because the mother had continued to fail to perform the tasks required to complete the evaluation and had failed to provide all the proper information to complete the evaluation, DFCS finally closed the case at the end of February 2006 and thus did not approve the home the mother was living in for a reunification with her children. In particular, DFCS never received current or properly updated physical and drug-screen *1112 information for both the mother and her husband, M.G.,[4] updated financial information regarding the mother's and M.G.'s salaries and how they met their financial needs (including rent), a child-care plan for ensuring that the children would be looked after, and copies of state identification cards for the mother and M.G.
Reames testified that the mother had ample time to complete the paperwork and provide the required documentation (over two months), but had failed to do so. Bits and pieces of the required information were provided at times, but never all of it. All the information, according to Reames, had to be current(i.e., within the previous 30 days) when submitted to the DFCS. Reames also testified that it was her understanding that the mother had temporary employment, but nothing stable during the time Reames was trying to assist the mother with the home evaluation.
Terrell testified that during this time she continued to question the mother about potential relative placements for the children in order to locate someone to take custody of the children, at least temporarily until the mother was ready to get them back. According to Terrell, the mother had always maintained that her mother, the children's maternal grandmother, was too unstable to take care of the children.
The mother did suggest her father as the most stable potential placement for the children. However, upon Terrell's initiating contact with him, it was revealed that he had prior felony convictions involving drug trafficking and shoplifting in 1993 and that he had spent two years in jail. Therefore, because of his criminal background, and despite his interest in accepting custody, Terrell testified that DHR could not place the children with him.
Terrell further testified that the mother had also told Terrell that an aunt in Mobile might be able to take custody of the children; however, the mother subsequently contacted Terrell and told her that the aunt was not willing to help.
Finally, Terrell testified that she had contacted B.L.'s mother (the alleged paternal grandmother of A.L.) about assuming custody of the children but that B.L.'s mother had expressed a desire to possibly accept custody of only A.L., if B.L. did not get custody, and that she later told Terrell that her home was not currently adequate to have custody of a child.[5] Terrell also testified that the mother never wanted B.L. to have custody of the children.
Terrell testified that she believed she had exhausted all potential relative placements for the children. Her testimony as to the potential relative placements and the responses by the individuals contacted was never contradicted at the termination hearing.
The evidence from the record also showed that the mother had never paid child support as ordered and had not provided any material needs for the children during the time DHR and foster mother had custody of the children.
During the time the children were in foster care, weekly visitation periods were arranged for the mother at the day-care center in Columbus where the foster mother worked. The foster mother testified that she told the mother that she could *1113 visit the children whenever she was able. Terrell testified that this was done to make it easier for the mother to attend visitation in light of the mother's transportation difficulties. However, Terrell and the foster mother testified that the mother did not regularly attended the visitation periods and would not show up for weeks at a time, many times with no contact or reasons provided for the absences. Terrell's records indicated that the mother had missed approximately 36 visits over the 18 months, preceding the termination hearing.
Terrell and the foster mother further testified that when the mother did visit the children, many times she would stay for 20 minutes or less and that this disturbed and confused the children.
The foster mother testified that H.D. was currently in counseling because she "acted out sexually" on a regular basis by masturbating, which was done many times in public places, and liked to expose herself to the other children in the day-care center. According to the foster mother, H.D. instigated what some of the children called "naked parties" where H.D. and two young boys in the class would go into a play area and pull their pants down and show their private parts to each other. H.D. was almost five years old and A.L. was three years old at the time of the hearing.
Terrell and the foster mother also testified that, despite DHR's willingness to arrange free transportation, the mother did not attend H.D.'s surgery at Children's Hospital South in Birmingham to remove her venereal warts and did not show up for A.L.'s procedure to have tubes placed in his ears at the Medical Center in Columbus.[6]
The mother testified that, before and after DHR became involved, most of her difficulties in scheduling or attending appointments or surgeries, in attending visitation, and in paying child support were due to inadequate finances and lack of transportation. However, she claimed that, at the time of the termination hearing, her husband's job was financially stable enough to adequately take care of the two children, as well as another child she currently had custody of, and that she was more familiar with the metro bus schedule and routes and had been informed of a Medicaid van that could provide transportation to and from medical appointments.
At the time of the termination hearing, the uncontradicted testimony revealed that the mother had recently been evicted from the Columbus Housing Authority unit in which she was living because the information on the application provided by the mother indicated that she would be living with her two children, when, in fact, she had been living with her new husband and their newborn child who had been born on August 26, 2005. Shortly before the hearing, the mother and her family had moved into a two-bedroom house in what the mother called a "bad section of town."
Additionally, the mother, after moving to Georgia, had gained employment through a temporary employment agency doing construction-type work, but she was laid off in February 2006. A week before the termination hearing, she had regained employment at a car-wash facility.

Standard of Review
The standard of review for ore tenus proceedings in an action to terminate parental rights is well established. "[A] *1114 trial court's decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong." Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala.1993). See also Ex parte State Dep't of Human Res., 890 So.2d 114 (Ala.2004).
The statutory grounds for terminating parental rights is found in § 26-18-7, Ala. Code 1975, a part of the 1984 Child Protection Act, § 26-18-1 et seq., Ala.Code 1975 ("the Act"). That section of the Act provides, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, as herein defined;
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child;
"(3) That the parent has tortured, abused, cruelly beaten or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat or otherwise maltreat the child, or the said child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling;
"(4) Conviction of and imprisonment for a felony;
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent;
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"a. Murder or voluntary manslaughter of another child of that parent.
"b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
"c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term "serious bodily injury" means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
"(8) That parental rights to a sibling of the child have been involuntarily terminated.

*1115 "(b) Where a child is not in the physical custody of its parent or parents . . ., in addition to the foregoing, [the court] shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
§ 26-18-7, Ala.Code 1975.
When the petitioner to terminate parental rights is someone other than a parent of the child or children in question, the trial court must find by clear and convincing evidence (1) that the child is dependent and (2) that a less-drastic alternative to termination is unavailable. See § 26-18-7, Ala.Code 1975; Ex parte Beasley, 564 So.2d 950 (Ala.1990); and R.P. v. State Dep't. of Human Res., 937 So.2d 77 (Ala.Civ.App.2006). To support a finding of dependency, the court must find that there are grounds for terminating the parental rights, including, but not limited to, the grounds specified in § 26-18-7. R.P., 937 So.2d at 81 (citing Ex parte Beasley, 564 So.2d at 954).
Furthermore, "the party seeking to terminate parental rights has the burden to present clear and convincing evidence showing that the parent is not capable or is unwilling to discharge his or her parental responsibilities and that there are no viable alternatives to terminating parental rights." Ex parte T.V., 971 So.2d 1, 4 (Ala.2007).

Dependency
It is clear from the record that DHR met its burden of proof in this case and that, based on the evidence at the termination hearing, the juvenile court could have reasonably concluded by clear and convincing evidence that the children were dependent and that there were sufficient grounds for terminating the mother's parental rights.
The juvenile court found that DHR had made reasonable efforts to rehabilitate the mother for the purpose of reunifying her with her children but that those efforts had failed. This is one of the grounds a court is to consider when determining whether a parent is unable or unwilling to discharge his or her duties as a parent. See § 26-18-7(a)(6), Ala.Code 1975.
The evidence showed that DHR tried to inform the mother of all the medical and health issues her children were going through and to provide her with transportation when the children were undergoing what DHR considered to be major medical procedures. However, the mother did not accept the offered transportation, and either her own attempts to provide transportation for herself so that she could be present when the children were undergoing those medical procedures did not work or she did not attempt to attend.
DHR and the foster mother also tried to make visitation with the children convenient for the mother, but the mother never regularly visited the children over the 18-month *1116 period that the children were in foster care. Terrell's testimony was that the mother had missed 36 visits with the children, and the foster mother testified that many times the mother did not stay longer than 20 minutes when she did come and visit the children at the foster mother's day-care center in Columbus.
Because the mother moved to Georgia, DHR had to utilize the ICPC process in order to conduct a home evaluation of the mother's home, but the Muscogee County DFCS in Georgia would not approve a home evaluation for the mother because of the mother's failure to provide the required information and documents. Reames, from DFCS, testified that the mother had more than two months to complete the paperwork and that the time-frame given her was more than adequate. She stated that she had to close the case without approval because of the mother's noncompliance.
DHR developed several Individual Service Plans ("ISPs") for the mother, emphasizing the goals DHR had for her regarding the rehabilitation process for regaining custody of her children. Those goals included cooperating with DFCS regarding the home-evaluation process, maintaining visitation with the children, and obtaining stable housing and employment. The mother, however, completed none of those goals. Therefore, the evidence supported the juvenile court's determination that DHR's efforts were reasonable but that they failed.
The mother argues that DHR should have gone to Georgia to investigate or inspect the home-evaluation process conducted by DFCS, and, if necessary, should have provided rehabilitative services to the mother while she was residing in Georgia. Counsel for the mother cites D.S.S. v. Clay County Department of Human Resources, 755 So.2d 584 (Ala.Civ.App.1999), for this proposition.
This court, in D.S.S., stated as follows:
"[I]f DHR, in an Alabama court, seeks to terminate the parental rights of a [parent] residing in Georgia, as to children residing in Alabama, on the ground that `reasonable efforts by DHR leading toward the rehabilitation of the [parent] ha[d] failed,' it must do more than suggest one time to the [parent] that [they] contact the appropriate Georgia agency about having a home study done."
Id. at 590. However, this principle and our decision in D.S.S. do not support the contention that DHR is required to have its personnel physically cross state lines to perform a home evaluation in another state where it does not have jurisdiction.
In M.H. v. Calhoun County Department of Human Resources, 848 So.2d 1011 (Ala. Civ.App.2002), this court held that DHR is not required to perform a home evaluation in another state where a parent resides before terminating that parent's parental rights. Id. at 1016. Rather, we held in M.H. that the circumstances of that case warranted termination of the mother's parental rights when DHR had offered rehabilitative services to the mother for almost two years and had decided to seek termination of her parental rights based on her continued failure to adjust her circumstances to meet the needs of her children. Id. at 1016.
In M.H. this court distinguished our decision in D.S.S. from the circumstances of that case by stating that in D.S.S. DHR had failed not only to offer any rehabilitative services to the father, who resided in Georgia, but also to even investigate the father's circumstances to determine if he needed those services. Id. at 1017.
The present case is also distinguishable from D.S.S. because DHR continued to *1117 offer services to the mother even though she lived in Columbus, Georgia. DHR, along with the foster mother, provided visitation for the mother with the children at a day-care center in Columbus, offered to provide transportation to medical procedures for the mother's children, and continued to stay in contact with the mother and be apprised of her situation to continuously evaluate the possibility of reunification with the children.
DHR also maintained communication with DFCS in Muscogee County, Georgia, and ensured that a home-evaluation process had begun. It is not the fault of DHR that the mother did not provide all the necessary information and paperwork required by DFCS to complete the home evaluation. DHR was simply acting pursuant to statutory law  the ICPC.
At the very least, it can be said that DHR did much more in this case than simply "suggest one time to the [mother] that [she] contact the appropriate Georgia agency about having a home study done." See D.S.S., 755 So.2d at 590. Therefore, the present case is distinguishable from in D.S.S., and we cannot say that the juvenile court erred by finding that DHR made reasonable efforts to rehabilitate the mother, even though DHR did not send personnel to physically conduct a home evaluation of the mother while she was living in Georgia. See M.H., supra.
Furthermore, the juvenile court must additionally consider a parent's (1) failure to provide for the material needs of the child or to pay a reasonable portion of its support, when the parent is able to do so; (2) failure to maintain regular visits with the child in accordance with a plan devised by DHR and agreed to by the parent; (3) failure to maintain consistent contact or communication with the child; and (4) lack of effort to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources. See § 26-18-7(b), Ala.Code 1975.
The uncontradicted evidence at trial demonstrated that the mother never paid any child support after DHR removed the children from her custody and never regularly attended visitation with the children, missing visitation several weeks at a time. The mother also failed to attend major medical procedures for her children and failed to provide the necessary information to get her home evaluation approved by the Muscogee County DFCS.
Given these facts, the juvenile court could have reasonably found that all of the four factors under subsection (b) of § 26-18-7 were met in this case by clear and convincing evidence. Therefore, the juvenile court's determination that clear and convincing evidence warranted a finding of dependency was supported by the evidence.
Additionally, due to the undisputed evidence indicating that the mother had never maintained regular visitation with the children, had never paid child support, had been unable to find stable employment and had just started a job a week before the termination hearing, and had only recently moved into her current home due to eviction from her previous residence at a housing development run by the Columbus Housing Authority, the juvenile court's determination that the mother's situation was unlikely to change in the foreseeable future was also supported by the evidence. See M.M. v. State Dep't. of Human Res., 689 So.2d 174 (Ala.Civ.App.1997).

Alternatives to Termination
The record also supports the juvenile court's determination that DHR met its burden of proving by clear and convincing *1118 evidence that there were no viable alternatives to termination, and we cannot say that the juvenile court's decision was plainly or palpably wrong. See Ex parte State Dep't of Human Res., 624 So.2d at 593.
The mother contends that DHR did not properly investigate or consider her mother, her maternal aunt, or her father to determine whether placing the children in the custody of one of them would be a viable alternative to the termination of her parental rights. She claims that, according to D.S.S., DHR, not the prospective custodian, has the burden of initiating investigations and that it is DHR's burden to prove the unsuitability of one who seeks to become a custodian. 755 So.2d at 591.
The mother's assertion that DHR has the burden of initiating investigations when it comes to searching for an alternative to termination is correct. However, the record supports the juvenile court's determinations that no viable alternatives to parental termination existed and that DHR had investigated and adequately pursued all potential relative placements for the children.
According to the testimony at the hearing, Terrell claimed that she had continuously asked about potential relative placements but was unable to locate any to take custody of the children. According to Terrell's testimony, all the potential relative placements suggested by the mother on appeal were considered unsuitable.
Terrell testified that the mother had always maintained that her mother was unstable and unable to care for the children. The mother also admitted this at the hearing. Now counsel for the mother argues on appeal that it was still the burden of DHR to investigate the mother as a possible alternative.
However, DHR is not required to further investigate a potential relative placement when the parent opposes such placement. See M.J.G.L. v. State Dep't. of Human Res., 587 So.2d 1004 (Ala.Civ. App.1991) (upholding DHR's determination that a paternal aunt was not a suitable relative placement due to the mother's opposition to such placement).
The evidence also showed that the mother's father was considered by DHR and was determined to not be a suitable placement for the children due to his criminal background. In M.J.G.L., supra, this court upheld DHR's determination that the father of the children in question was not a suitable placement option due to his prior felony convictions. Our prior caselaw reflects that this court has consistently upheld trial court judgments finding that a potential relative placement was not a viable alternative due to DHR's determination that the placement was unsuitable because of prior convictions of felonies. See, e.g., M.E. v. Shelby County Dep't of Human Res., 972 So.2d 89 (Ala.Civ.App.2007); M.J.G.L., supra. Furthermore, this court cannot find any authority requiring that DHR to further investigate a potential relative placement upon learning of that potential placement's criminal background. In fact, relevant statutory and regulatory provisions, as well as precedent from prior cases, support the principle that DHR is permitted to deny a potential placement for a child in DHR's custody based upon prior felony convictions.[7]See § 12-15-71(a)(3)c, Ala.Code 1975(requiring DHR to investigate relatives of a dependent child to determine if they are "qualified," but not defining what makes a person "qualified"); *1119 Rule 660-5-29-.02(4)(c)4(i)V, Ala. Admin. Code (adopted by DHR in light of the Adoption and Safe Families Act, 42 U.S.C. § 671(a)(20), and providing that a person may not be considered for foster care if he or she has been previously convicted of certain felonies, including the sale or distribution of controlled substances); M.E., supra; and M.J.G.L., supra.
The evidence at the hearing also revealed that, although the mother initially suggested her aunt to Terrell, she contacted Terrell later and told her that the aunt was not interested in accepting custody of the children.
The mother never wanted B.L. (the alleged father of A.L.) to have custody of the children, and Terrell even testified that she had contacted B.L.'s mother regarding custody of the children but that B.L.'s mother had responded that she was currently unable to handle any children in her home.
There was no other evidence presented regarding any other less drastic alternatives to termination. Therefore, the juvenile court's determination that there were no viable alternatives was supported by the evidence, and it was clear that DHR investigated potential relative placements for the children. See M.J.G.L., 587 So.2d at 1005.
In light of the ore tenus presumption, this court cannot say that the decision to terminate the parental rights of the mother was plainly or palpably wrong. There was clear and convincing evidence to support the juvenile court's judgment concluding that the children were dependent, that termination of the mother's parental rights was warranted, and that there were no viable alternatives to termination. R.P., supra.
The judgment of the Lee Juvenile Court is therefore affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs in the result, without writing.
MOORE, J., dissents, with writing.
MOORE, Judge, dissenting.
I respectfully dissent. I do not believe that the Lee County Department of Human Resources ("DHR") discharged its burden of proving by clear and convincing evidence that there existed no less drastic alternative to termination of the mother's parental rights. See Ex parte Beasley, 564 So.2d 950 (Ala.1990). In particular, I believe that DHR did not adequately investigate the children's maternal grandfather before eliminating him as a relative resource. See Ex parte J.R., 896 So.2d 416 (Ala.2004).
The record shows that DHR opened its case on May 11, 2005. Originally, DHR placed the children with a neighbor. About a month later, the neighbor turned custody over to DHR, which then placed the children in a foster home. At some point after the children had been in foster care for several months, the mother informed Laura Terrell, her caseworker, that she had contacted her father, the children's maternal grandfather, who resided in Mississippi, "about possibly becoming a relative placement in the event that custody is not returned to her." The mother stated that the maternal grandfather had a past history of drug abuse but that he had "turned his life around." Based on that information, Terrell telephoned the maternal grandfather. During that telephone conversation, the maternal *1120 grandfather indicated that he was interested in taking custody of the children.
During that same telephone conversation, the maternal grandfather informed Terrell that in 1993 he had been convicted of two felonies, which Terrell recalled at trial as being for drug trafficking and shoplifting. The maternal grandfather further related that, after serving two years in jail, he had remarried and started a new family. Terrell concluded that the maternal grandfather "is unable to care for [the children] due to his criminal record of two felonies." As a result, she testified at trial that "[the maternal grandfather] was previously convicted of two felonies. Due to his criminal background, we could not place the children with him."
The foregoing evidence establishes without dispute that DHR automatically disqualified the maternal grandfather from consideration as a relative placement on the sole basis of his prior felony convictions. The juvenile court implicitly endorsed that decision when it terminated the mother's parental rights based partially on its finding that there was no viable alternative to termination.
While refusing to declare a per se rule that a prior felony conviction automatically disqualifies a relative from acting as a custodian, see note 7, the main opinion nevertheless affirms the juvenile court's judgment. The main opinion states that there is no legal authority requiring DHR to further investigate a potential relative placement after learning of that relative's criminal background. The main opinion further states that the law supports DHR's decision to deny a potential relative placement for a child in DHR's custody based solely on the relative's prior felony conviction. I disagree.
DHR has the burden of initiating investigations regarding potential relative resources, and it is DHR's burden to prove the unsuitability of one who seeks to be considered as the custodian of a dependent child. Ex parte J.R., 896 So.2d at 428 (quoting D.S.S. v. Clay County Dep't of Human Res., 755 So.2d 584, 591 (Ala.Civ. App.1999)). Section 12-15-71(a)(3)c., Ala. Code 1975, specifically requires DHR to investigate relatives of a dependent child to determine if the relative is "qualified" to receive and care for a child. The term "qualified" is not defined in the statute or in corresponding regulations promulgated by DHR.
Rule 660-5-29-.02(4)(c)(4)(i)(V), Ala. Admin. Code, which DHR adopted to comply with the federal Adoption and Safe Families Act ("the AFSA"), 42 U.S.C. § 671(a)(20), states that a person may not be considered for foster care if that person has ever been convicted of a crime involving the sale or distribution of a controlled substance.[8] However, neither 42 U.S.C. § 671(a)(20) nor Rule 660-5-29-.02(4)(c)(4)(i)(V) applies to relative placements.[9]
In many cases, this court has cited the criminal history of a potential relative placement in upholding a factual finding *1121 that the relative was unsuitable to care for and receive a child. See, e.g., M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004 (Ala.Civ.App.1991); and D.S. v. State Dep't of Human Res., 586 So.2d 942 (Ala.Civ. App.1991). However, in those cases, the criminal history constituted only one piece of evidence, the totality of which proved that the relative was unsuitable to assume a quasi-parental role.
In short, neither the legislature, DHR (the agency responsible for investigating potential relative placements), nor the appellate courts of this state have construed the term "qualified" contained in § 12-15-71(a)(3)c. as automatically excluding relatives with a criminal history from consideration as a relative placement. The law simply does not support the main opinion's position that DHR has no duty to fully investigate a potential relative placement upon learning that the relative has a prior felony conviction. Moreover, it is inconsistent to acknowledge that a prior felony conviction does not per se disqualify a relative from being considered for placement, but at the same time hold that DHR has no duty to further investigate a relative, and may deny any consideration of the relative as a potential placement, once it discovers the relative's prior felony conviction.
In V.M. v. State Department of Human Resources, 710 So.2d 915 (Ala.Civ.App. 1998), DHR determined that the maternal grandmother of the dependent children in that case was not a viable relative resource based entirely on events and circumstances occurring two years before the hearing to terminate the mother's parental rights. The court stated:
"All of DHR's objections to the grandmother as a relative resource were based on past history, however, and there was no evidence that she had been considered in light of her present circumstances, her present willingness to be a resource for the children, and the present improvement in the mother's condition. DHR must present `evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least drastic alternative.' Bowman [v. State Dep't of Human Res.], 534 So.2d [304,] 306 [ (Ala.Civ.App.1988) ] (emphasis added). In light of the evidence that the grandmother's present circumstances had not been investigated, the trial court's decision to terminate the mother's parental rights based upon the lack of viable alternatives was plainly and palpably wrong. See G.D.M. v. State, 655 So.2d 1020 (Ala.Civ.App.1995); T.D.M.V. v. Elmore County Dep't of Human Resources, 586 So.2d 931 (Ala.Civ. App.1991)."
710 So.2d at 921. V.M. amply demonstrates that DHR may not simply dismiss a potential relative resource on the basis of a 14-year-old criminal conviction, especially in light of evidence indicating that the relative has "turned his life around" and is currently maintaining a family, including children of his own. The duty remains on DHR to further investigate the relative to determine if, in spite of his or her past criminal conviction, the relative is suitable to receive and care for the children at issue.
In this case, DHR did not perform a home study or otherwise investigate the maternal grandfather; instead, it abruptly ended its inquiry upon learning of his prior criminal convictions. Terrell candidly testified that she disqualified the maternal grandfather based solely on that evidence. The juvenile court should have required a more thorough investigation into the maternal grandfather's current character and conditions before concluding that the maternal grandfather was not a viable relative *1122 resource. As it stands, the record does not contain clear and convincing evidence regarding whether the maternal grandfather is or is not qualified to receive and care for the children. Because the burden of proof on this issue rests with DHR, I would reverse the judgment and remand the case for DHR to conduct an adequate investigation of the maternal grandfather.
NOTES
[1] The unknown father of H.D. and the alleged father of A.L. did not appeal the termination of their parental rights.
[2] The mother testified that when she first took H.D. to the emergency room after noticing what looked like a rash, she requested that a rape test be performed on H.D. and claimed that the test came back saying that H.D. had not been "tampered with."
[3] According to DHR and the testimony at the termination hearing, the foster mother planned on adopting the children pending the outcome of the termination hearing.
[4] The mother married M.G. on August 11, 2005.
[5] B.L.'s parental rights were terminated in this case due to a presumption of abandonment under § 26-10C-1, Ala.Code 1975. He never showed up at the hearings despite receiving service of process, and he never attempted to prove his paternity of A.L. Therefore, the option of placing both the children with the alleged father of A.L. is not at issue in this appeal.
[6] The record is also void of any indication that any of the alleged fathers or relatives attended the children's medical procedures.
[7] However, we do not hold that a prior felony conviction automatically bars a potential relative placement from being considered as a viable alternative to terminating a parent's parental rights.
[8] The AFSA, 42 U.S.C. § 671(a)(20), likewise creates an irrebuttable presumption that a person convicted of certain criminal offenses is not suitable to adopt or to maintain custody of a child. In In re Adoption of Corey, 184 Misc.2d 437, 707 N.Y.S.2d 767 (N.Y.Fam.Ct. 1999), the court declared that presumption to be unconstitutional because it foreclosed an individual from proving that he or she had been rehabilitated and that he or she was now suitable to adopt or maintain custody of a child and because it arbitrarily deprived the child of a relationship with a suitable parent.
[9] Unlike agencies in other states, see, e.g., Cal. Welf. and Inst.Code § 361.4 (West 2006), Alabama's DHR has not adopted any regulations concerning qualifications to be a relative placement.