THOMAS, Judge.
K.J. (“the mother”) appeals from separate judgments terminating her parental rights to her two sons, three-year-old K.G. and six-year-old J.J.[1] We affirm.
The mother has four children. In addition to the sons who are the subject of this appeal, she also has two daughters — L.J., who is 14 years old, and Q.J., who is 16 years old. The mother’s husband, from whom she is separated, is the father of all four children. The family had been the subject of child-abuse-and-neglect complaints for 10 years before the Department of Human Resources (“DHR”) received a report in 2005 alleging that the father had abused Q.J. with an extension cord. Upon investigating that report, police officers found the family’s house to be filthy and infested with roaches. DHR provided the family with protective services, including assistance from an entity referred to in the record as “Family Options” and in-home aides. The mother refused DHR’s offer of aides to help her clean the house, stating that she could do the cleaning herself.
In August 2005, when the youngest child, K.G., was a month old, he was hospitalized as a failure-to-thrive infant. DHR determined that the mother had not understood how to mix KG.’s powdered formula and had been feeding the child mainly water. Upon his release from the hospital on August 29, 2005, K.G. was placed in foster care. The three older children were placed in foster care several days later after DHR caseworkers visited the family’s house and found it to be filthy, roach-infested, and reeking of urine. The caseworkers learned that the father had left the house because it was so dirty and had gone to live with his mother. After the children were placed in foster care, DHR provided the mother with a psychological evaluation, counseling, supervised therapeutic visitation, and parenting-skills training that included instruction on disciplinary techniques, appropriate family interaction, communication, and budgeting.
Dr. April Lane, who has a Ph.D. in counseling, performed a psychological evaluation of the mother. Dr. Lane testified that the mother is in the mild range of mental retardation, with a full-scale I.Q. of 62. She stated that the mother “very clearly loves her children and [is] concerned about them, but she lack[s] understanding of the[ir] special needs.” All four children are special-needs children. Sixteen-year-old Q.J. is mentally handicapped and suffers from oppositional-defiant disorder (“ODD”) and attention deficit/hyperactivity disorder (“ADHD”). Fourteen-year-old L.J. has a learning disability, suffers from depression, and has an adjustment disorder. Six-year-old J.J. is mentally handicapped and has a speech disorder. Three-year-old K.G. is clumsy, falls often, cannot run in a straight line, speaks few words and no sentences, and is not toilet trained.
Dr. Lane gave her opinion that, because of her cognitive deficits, the mother is unable to parent the children independently. Dr. Lane said that with a very good, direct support system, such as someone’s living in her house or nearby to provide constant guidance, the mother would be an able parent. Dr. Lane testified that the mother did not have a reliable support system. The mother had reported to Dr. Lane that her pastor, Daisy Bryant, was her support system, but Dr. Lane expressed doubts about Pastor Bryant’s *973 judgment when she learned that Bryant had advised the mother to use corporal punishment to discipline Q.J., who was 14 years old at the time, and to have Q.J. put in a detention facility if the discipline did not work. The mother admitted at trial that she had kicked Q.J. in the eye when she refused to get up and get ready for school.
Jessie Berkley, a social worker and therapist, observed and supervised the mother’s bimonthly visitations with J.J. and K.G. Berkley testified that the visits were chaotic because the mother did not have the capacity to interact effectively with the children. Berkley coached the mother and suggested effective disciplinary techniques. According to Berkley, the mother was cooperative and highly motivated, but she was simply unable to implement what Berkley had tried to teach her. Berkley stated that the boys reacted well when she herself used the disciplinary techniques, but, she said, they paid no attention to their mother’s efforts to discipline them. Berkley concluded that the mother could not safely care for the children without supervision.
DHR referred the mother to three organizations that provide assistance to mentally handicapped individuals: the Betty Woods therapeutic agency, the Helping Hands agency, and Ability Alliance, an “umbrella” agency providing a range of services for the mentally handicapped. The record does not indicate whether the mother took advantage of the services of the Betty Woods or Helping Hands agencies. The mother failed to schedule an appointment with Ability Alliance, even after DHR caseworkers had repeatedly reminded her to do so.
During the two years before the trial of this case, the mother had been employed at several fast-food restaurants, but none of her jobs had lasted very long. The record indicates that she had usually lost jobs because of her failure to understand or follow directions. The mother receives $646 per month in Supplemental Security Income (“SSI”) and Social Security benefits. Each of her four children receives $579 per month in SSI benefits. When the children were removed from her home, the mother lost the income from the children’s SSI payments. Consequently, she had been unable pay her rent or to find an affordable housing based on her income alone. At the time of trial, she was living with her mother, her mother’s boyfriend, and her great-aunt in a two-bedroom apartment. DHR offered the mother housing assistance, but, the mother said, when she inquired as to public housing, she was told that she did not earn enough to pay the rent on any of the apartments she had visited. The mother relocated twice during the time that the children were in foster care, but both times the housing was in a dangerous neighborhood that was unsafe for children.
DHR foster-care worker Jennifer Payne testified that, before DHR moved to terminate the mother’s parental rights, she had learned of a group home in Birmingham that might accept the mother and children as residents and assist the mother in parenting the children. In January 2007, Payne discussed with the mother the fact that the group home might be the mother’s last opportunity to regain custody of her sons, but the mother declined to consider the group home because, she said, she did not know anyone in Birmingham and did not want to leave Tuscaloosa, where her family members were.
Following three days of testimony, the juvenile court entered separate judgments on March 7, 2008, terminating the mother’s parental rights to J.J. and K.G. The *974 mother timely appealed to this court.[2]
I.
The mother contends that DHR failed to prove by clear and convincing evidence that there was no viable alternative to the termination of her parental rights. Specifically, she claims that, because she testified at the termination hearing that she was willing to reconsider the Birmingham group home that she had previously rejected in January 2007, all viable alternatives to termination had not been exhausted. The mother cites R.P. v. State Department of Human Resources, 937 So.2d 77 (Ala.Civ.App.2006), to support her argument that the group home was a viable alternative.
Putting aside for the moment the fact that this court’s plurality decision in R.P. has no precedential value, that case is distinguishable on its facts. In R.P., the mother’s lack of housekeeping skills had resulted in an unsanitary and unhealthy living environment for the children. The DHR caseworkers had noticed, however, that whenever the maternal grandmother was present, the house and the children were clean. Nevertheless, DHR had failed to conduct a home study of the grandmother and had discounted her offer, at the termination hearing, to “assist the mother on a regular basis.” 937 So.2d at 81. Clearly, R.P. involved DHR’s alleged failure to investigate the grandmother as a viable alternative. In the present case, DHR was not guilty of any failure to investigate the group home as a viable alternative. Instead, DHR suggested the group-home alternative to the mother. The mother not only flatly rejected that alternative a year before trial, but she also failed to mention it again, despite the fact that the termination of her parental rights was looming as a possibility, until the trial. In answer to a question by the father’s attorney regarding whether the mother understood, at the time DHR suggested the group home in January 2007, that if she refused that option she “might not get [her] children back,” the mother testified, “I understand it then.... I just wanted to stay in Tuscaloosa.” Additionally, when questioned about her change of heart with respect to the group home, the mother testified:
“Q. [By counsel for DHR]: The group home that’s been referenced in Birmingham, do you understand that even if they had an opening, that DHR would ask that you stay there permanently until the children were grown. [I]t’s not like a program where you would go get rehabilitated and come home in six months. Do you understand that?
“A. Uh-huh, I understand.
“Q. And you would be willing to move there forever?
“A. See, with me, I feel that Pm able to get my own place, you know. I’ve been out about seven, eight years on my own and I stayed in several places in Tuscaloosa.
“Q. But, ... you still live with your mother, right?
“A. Yes, uh-huh.”
(Emphasis added.) The mother’s testimony does not indicate a commitment to accept the group-home arrangement that, she argues, is a viable alternative. It indicates, instead, an insistence on her ability to “get her own place.” Given DHR’s evidence indicating that there is no assurance that the mother and children would even be accepted in the group home if she were to apply at this late date, and the mother’s less than steadfast desire to live in the group home, we conclude that the *975 juvenile court did not err in concluding that there was no viable alternative to the termination of the mother’s rights.
II.
The mother argues that the Alabama Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, specifically § 26-18-7(a)(2), which allows the termination of parental rights based on a parent’s “mental deficiency,” and § 26-18-7(a)(8), which allows the termination of parental rights based on the fact that “parental rights to a sibling of the child have been involuntarily terminated,” violates the Americans With Disabilities Act, § 42 U.S.C. § 12101 et seq. (“the ADA”). The mother presented this argument to the juvenile court, and that court rejected it on the merits. Although the mother cites no authority other than the text of the ADA itself in support of her contentions, we will address the argument because the juvenile court did so and because DHR has responded to the mother’s argument in its appellate brief.
The ADA, specifically 42 U.S.C. § 12132, provides:
“Subject to the provisions of this sub-chapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.”
The mother contends that DHR is a public entity that discriminated against her by terminating her parental rights on the basis of her mental deficiency. Pursuant to the ADA, a “mental impairment that substantially limits one or more of the major life activities of [an] individual” is a disability. 42 U.S.C. § 12102(2). The ADA requires a public entity to make “reasonable accommodation” to allow the disabled person to receive the services or to participate in the programs provided by the public entity. 28 C.F.R. § 35.130(b)(7)(1994).
Most of the ADA challenges to parental-rights-termination proceedings have been based on the premises either (1) that the ADA preempts a state’s termination-of-parental-rights statutes by virtue of the Supremacy Clause of Art. VI of the United States Constitution and, accordingly, that the party seeking termination must show that the requirements of the ADA have been met or (2) that the ADA constitutes a defense to a parental-rights-termination proceeding. Both types of challenges have been rejected by the vast majority of the courts that have considered them. See generally Sherry S. Zimmerman, Annot., Parents’ Mental Illness or Mental Deficiency as Ground for Termination of Parental Rights — Applicability of Americans with Disabilities Act, 119 A.L.R. 5th 351 (2004). The Hawaii Supreme Court presented an accurate summary of the law with respect to this issue in In re Doe, 100 Haw. 335, 60 P.3d 285 (2002):
“Many of the cases examining the issue of parental rights and the ADA hold that a termination proceeding is not a ‘service, program, or activity’ within the definition of the ADA and, consequently, the ADA does not apply to such proceedings. See In re Anthony P., 84 Cal.App.4th 1112, 101 Cal.Rptr.2d 423, 425 (2000) (‘a proceeding to terminate parental rights is not a governmental service, program, or activity’); In re Antony B., 54 Conn.App. 463, 735 A.2d 893, 899 (1999) (the ADA ‘neither provides a defense to nor creates special obligations in a parental rights termination proceeding’); M.C. v. Dept. of Children and Families, 750 So.2d 705, 706 (Fla.Dist.Ct.App.2000) (‘[Dependency proceedings are held for the benefit of the child, not the parent.’); In re Terry, 240 Mich.App. 14, 610 N.W.2d 563, 569 (2000) (‘Termination of parental rights proceed *976 ings are not “services, programs or activities” ... [and] therefore a parent may not raise violations of the ADA as a defense to termination of parental rights proceedings.’); In re Adoption of Gregory, 434 Mass. 117, 747 N.E.2d 120, 125 (2001) (‘Proceedings to terminate parental rights are not “services, programs, or activities,” under provision of [the ADA] ... and therefore, the ADA is not a defense to such proceedings.’).
“There is a smaller number of courts that avoid the ADA question by ‘finding on the facts presented that the State agency, through the provision of services designed to meet the parent’s special needs, had met any obligations that might be imposed by the ADA.’ Gregory, 747 N.E.2d at 125 (citing In re Angel B., 659 A.2d 277 (Me.1995) and In re C.M., 526 N.W.2d 562 (Iowa Ct.App.1994)); see also In re A.J.R., 78 Wash.App. 222, 896 P.2d 1298, 1302 (1995).
“A few courts hold that the ADA may be a defense to parental rights termination cases. See In re C.M., 996 S.W.2d 269, 270 (Tex.Ct.App.1999) (suggesting that the ADA may be defense to a termination proceeding, but rejecting the defense on procedural grounds); Stone v. Daviess County Div. of Children & Family Servs., 656 N.E.2d 824, 830 (Ind.Ct.App.1995) (if there were a statutory requirement to exert reasonable efforts to reunite parent and child, then that statute would be preempted by the ADA, but because there was none, the ADA did not apply).”
100 Haw. at 340-41, 60 P.3d at 290-91. In the present case, the juvenile court indicated, during in-court discussions with the parties and their attorneys at the close of the evidence, its belief that, if the ADA was applicable, then its reasonable-accommodation requirement was met because DHR used reasonable efforts to provide the mother with services tailored to her cognitive limitations in an attempt to reunite her with the children. See In re C.M., 526 N.W.2d 562 (Iowa Ct.App.1994); In re Angel B., 659 A.2d 277 (Me.1995); and In re Terry, 240 Mich.App. 14, 610 N.W.2d 563 (2000).
The judgment of the Tuscaloosa Juvenile Court is affirmed.
2070598 — AFFIRMED.
2070610 — AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in part and concurs in the result, with writing.

. The judgments also terminated the parental rights of the children’s father, M.G., who has not appealed.

. We have consolidated the appeals for the purpose of issuing one opinion.