994 So.2d 280 (2008)
M.A.J.
v.
S.F.
2070034.
Court of Civil Appeals of Alabama.
May 16, 2008.
*281 James E. Hart III, Brewton, for appellant.
Amanda C. Hines of Thompson, Garrett & Hines, L.L.P., Brewton, for appellee.
MOORE, Judge.
M.A.J., the mother, appeals from a judgment terminating her parental rights to D.O.J. and D.S.J., twins born on January 24, 2006. We affirm.

Procedural History
When the twins were born, the mother was 23 years old and the father was 30 years old. The Escambia County Department of Human Resources ("DHR") became involved immediately at the time of the twins' birth. DHR had had previous involvement with the family, and three other children had been removed from the mother's home. When the twins were six weeks old, DHR placed them in the temporary custody of S.F., a nonrelative. The mother and the father continued to have supervised visitation with the twins. In February 2007, S.F. filed with the Escambia Probate Court a petition to adopt the twins. The mother contested that petition and filed a petition seeking to have DHR return the twins to her custody. The mother also removed S.F.'s adoption petition from the probate court to the juvenile court. S.F. then petitioned the juvenile court to terminate the mother's and the father's parental rights so that she could proceed with the adoption of the twins.
The juvenile court conducted ore tenus proceedings on the adoption petition and on the petitions to terminate parental rights on August 15, 2007, and on September 4, 2007. On October 3, 2007, the juvenile *282 court entered its judgment terminating the parental rights of the mother and the father as to the twins. In its judgment, the juvenile court determined that the twins were dependent, that the parents were unable to discharge their responsibilities to and for the twins, that DHR had made reasonable efforts to rehabilitate the parents but that those efforts had failed, and that the conduct or condition of the parents was such as to render them unable to properly care for the children and that such conduct or condition was unlikely to change in the foreseeable future. The mother timely appealed.

Factual Background
At the final hearing, the following witnesses testified: Dr. Larry Faison, a psychologist; Dr. Frank McCloskey, a licensed professional counselor; Rhonda Johnson, a "Family Options" caseworker; Irene Johnson, a DHR caseworker; S.F., the temporary custodian of the twins; the mother; and the father.
Dr. Larry Faison testified that he held a Ph.D. in child and adolescent psychology, that he was board-certified as a licensed counselor in Alabama, and that he held three national certifications in forensics. He was certified as an expert in this case. He primarily performs evaluations under contract for DHR and other state agencies.
He evaluated the mother and the father in this case. He evaluated the father in January 2006.[1] At the time of the father's evaluation, the father reported having been previously diagnosed and treated for schizophrenia; he was taking medications for this condition. The father also reported using illegal drugs and alcohol. According to Dr. Faison, the father had a history of arrests for driving under the influence. Dr. Faison also performed intelligence testing on the father. His IQ score fell between 71 and 80, and his adjusted mental age was 22.7; he was 30 years old at the time of the test. Dr. Faison testified that the father admitted to having had hallucinations in the past; the father also reported a history of nightmares of killing others. Dr. Faison testified that, based on his evaluation of the father, it was his opinion that the twins would be at risk if left alone in the father's care. Dr. Faison did not believe that the father could adequately or safely care for the twins on his own, considering the father's test results, his limited mental ability, his mental illness, and his history of drug and alcohol abuse.
DHR had previously asked Dr. Faison to evaluate the mother; he had evaluated the mother on September 15, 2000, and again on February 5, 2003, in connection with other DHR investigations. Dr. Faison had found that the mother's family had a history of mental illness; the mother's mother had been admitted to a mental hospital for some unknown condition. Dr. Faison reported that the mother had been educated in a "mental retardation class" since first or second grade. Dr. Faison noted that the mother reported having been suspended from school on 20 separate occasions for fighting. There was some dispute in Dr. Faison's 2000 report as to whether the mother had completed her high-school-equivalency diploma at that time.
During the testing process, Dr. Faison noted that the mother exhibited poor impulse control and a very low frustration tolerance; he also noted that she was rather *283 dramatic and defiant. He testified that she appeared to have difficulty understanding the questions and tasks required of her for the testing. In some of the testing, she simply refused to comply with his requests. He also commented that the mother's basic hygiene skills appeared to be weak.
In 2000, Dr. Faison administered intelligence tests to the mother. At that time, she scored a 56 on the IQ test, and her adjusted mental age was calculated at 10 years old. At the time of the 2000 test, the mother was almost 18 years old. In 2003, Dr. Faison again administered intelligence tests to the mother. The mother generated an IQ score of 67, and her adjusted mental age at that time was placed at 16.5 years old. At the time that test was administered to her, the mother was actually 20 years old. Dr. Faison testified that the changes in the mother's test results from 2000 to 2003 were not statistically significant and did not indicate any improvement in the level of the mother's intelligence. The mother's test results from both 2000 and 2003 indicated to Dr. Faison that the mother had a mild degree of "mental retardation." Dr. Faison also testified that the mother's test scores indicated that she was functionally illiterate in reading identification, spelling, and arithmetic. He found that the mother had a first-grade skill level in those areas.
Dr. Faison could not obtain a valid profile on one of the mother's personality tests because the mother had marked every response false. However, the results of a different test indicated, in his opinion, that the mother was "primed to depart from the truth and to behave in an unethical and untrustworthy manner." He had concluded that it was difficult for the mother to think beyond the present and to consider the consequences of her actions; he also had concluded that she was prone to risk-taking behaviors and to reckless actions.
Dr. Faison testified that, in his opinion, the mother could not safely or adequately take care of the twins for a 24-hour period. He stated that "[s]he has a very hard time, probably, just taking care of herself." Dr. Faison had recommended to DHR that it consider seeking a termination of the mother's parental rights regarding the child at issue in the 2003 case because, at that time, he did not believe that the mother would be able to adequately nurture or parent that child. In this case, he testified that his opinion of the mother's abilities had not changed since 2003 and that he did not believe his opinion would change in the foreseeable future; he believed the mother had some type of brain damage that caused her mental deficiency.
On cross-examination, Dr. Faison testified that he believed it would be very difficult for the mother to hold employment but that it was possible she could perform a repetitive task like dishwashing. He also testified that he was not aware of people who possessed lower mental abilities than the mother's who were functioning independently and raising children. He observed that the mother would need someone to assist her at all times.
Dr. Frank McCloskey, a licensed professional counselor, testified that, among other things, he performs counseling under contract with various DHR agencies. The parties stipulated that he could testify as an expert. Dr. McCloskey had evaluated and counseled with the mother and the father from February 2006 to August 2006. Dr. McCloskey met with them once a week in their apartment. The mother had been readily available but the father had rarely been there. The mother had revealed multiple instances of domestic violence, including one instance that led to the father's being jailed for three days. Dr. *284 McCloskey had recommended that the mother leave the relationship, but she had not done so. The mother had, however, acted on Dr. McCloskey's advice to at least keep clothes at a friend's home in case of an emergency.
Dr. McCloskey testified that, on one visit in June 2006, the father had been present. The father had presented with a flat affect, a monotone voice, and a fixed gaze. During that session, the father had made statements indicating that he was Jesus, that he was God, and that the mother was "Mary the mother of Jesus." Dr. McCloskey testified that, if the father was present for the counseling session, he had typically behaved in this manner. In response to Dr. McCloskey's questions about medication, the father had responded that he did not need any medication. Dr. McCloskey also had reported other problems between the mother and the father. Dr. McCloskey testified that he had been concerned for the mother's safety and that he would be concerned for the twins' safety if they were in the care of the father.
Dr. McCloskey had also been concerned with the mother's ability to care for herself. On certain visits, she had appeared able to groom herself, but, on other visits, she had appeared ungroomed. The state of the apartment had varied widely; some days, it had appeared clean and neat, but, on other days, it had appeared "slovenly." The mother had seemed to have trouble remembering what needed to be done. He had suggested that she make a schedule of necessities that she needed to do on a daily basis, but the mother had not followed through with that suggestion.
Throughout Dr. McCloskey's counseling with the mother, the mother had expressed confusion and lack of understanding as to why DHR had become involved with her family. He often spoke with the mother about the loss of the twins from her home. The mother was clearly depressed about that fact, and she would sometimes cry.
Dr. McCloskey did not believe that the mother could perform the repetitive basic daily duties required to parent the twins. He acknowledged that the mother loved the twins, and he opined that she was teachable, but he doubted that she was capable of "doing the same thing over and over and over again, day after day." He observed that her abilities were limited, that her memory was poor, and that she would not accept direction or supervision. She had not been responsive to the suggestions he had made. Dr. McCloskey testified that DHR had stopped his counseling with the mother and the father in August 2006. Dr. McCloskey lost touch with both the mother and the father after August 2006. He had no information as to how either of them was doing at the time of the trial.
Rhonda Johnson, a worker with "Family Options," testified at the termination hearing. Family Options receives referrals from DHR; Family Options provides family-preservation services. Those services include addressing safety concerns or attempting to reunify families. Family Options typically works with a family from four to eight weeks at a time.
DHR referred the mother and the father in this case to Family Options around February or early March 2006. The twins were approximately a month old at that time. The reason for the referral was to address the mother's and the father's parenting skills. The goal of the referral was to ensure that the twins were safe in their parents' home without additional supervision. In this case, Rhonda Johnson spent 33 hours in the mother's home over a 3-week period. Johnson's contact was supposed to have lasted for four weeks, but her contact with the mother had been terminated *285 early because there were too many caregivers in the home. Johnson stated that she had not been able to guarantee that the twins were safe in the home because she had not observed some of the caregivers and did not know them.
Rhonda Johnson testified at the trial that the mother's attention span was very limited; one day she would remember how to prepare formula, but the next day the mother might not remember how to do so. Johnson testified that some days the mother did a good job changing the twins; some days she did not. Additionally, the way the mother physically handled the twins had made Johnson nervous. Johnson testified that she had been concerned about the mother's attention span, her childlike behavior, and the way she physically handled the twins.
Rhonda Johnson's report of her work in the mother's home, prepared on March 10, 2006, was admitted into evidence without objection. In that report, Johnson stated that the mother's strengths were that she provides for her family, that she is a good cook, and that she loves the twins. However, Johnson also indicated that the mother is mentally ill and needs to improve her parenting skills to the point of being able to care for the twins safely without supervision. Under the heading "Recommendations," Johnson had indicated that the mother had shown some improvement in caring for the twins but that "it was not enough and much supervision is needed to determine whether or not she can parent alone. Therefore, we feel it is in the babies' best interest to continue the 24-hour supervision." Johnson's opinion of the mother's abilities had not changed by the time of trial; at trial, Johnson testified that she did not feel comfortable saying that the twins would be safe if left alone with the mother.
This was Rhonda Johnson's third time to work with the mother. In working with the mother in the past, Johnson had never recommended to DHR that the mother have care and custody of children without supervision. In Johnson's opinion, the mother was willing to improve and had really tried her best. However, the mother just had not improved to the point that she could care for the twins safely.
Irene Johnson, a social worker employed by DHR, testified. Johnson had been the DHR caseworker assigned to this case. The reports she generated from her work with this family were admitted into evidence without objection. Johnson testified that she had been involved with the mother since 2000; she testified that DHR had provided assistance with three of the mother's children before this case. The mother's rights as to one of those children had been terminated. The other two children had been placed in relative care.
When DHR became involved in this case, the goal was to help the mother develop the skills to keep the twins. DHR established a service plan, calling for 24-hour supervision. The mother's church had set up a schedule of volunteers to be in the home around the clock to help the mother and to supervise the care of the twins. However, problems had occurred in the homethe mother had not been cooperative and some of the caregivers had expressed fear of and concern about the father. Other volunteers had begun taking the twins out of the home. The mother even went home for an extended period with one of the volunteers and the twins. Irene Johnson testified that that situation had not worked. When the twins were six weeks old, they were placed in the temporary custody of S.F.[2]
*286 After the twins were removed from the home, the mother and the father were given supervised visitation with them. The father did not often show up for the visits, but the mother did. In May 2006, visitation was modified; the mother and the father were granted additional supervised visitation with the twins at the mother and father's apartment.
Irene Johnson stated that the mother and the father were offered parenting classes at "Hope Place." The mother did not complete that program. Johnson testified that the father had never attended that program. Johnson was also aware that domestic violence was an issue for the mother and the father. DHR provided ongoing counseling for the parents.
Irene Johnson testified that, in her opinion, the mother could not provide a stable and safe home for the twins by herself. In addressing potential placements, Johnson identified a paternal aunt who had assisted the mother in caring for the twins during one or two weekends. However, this paternal aunt was not available to serve as a relative placement because she had a child of her own. The twins' paternal grandmother had expressed that she could not accept the twins into her home. Another relative of the father's had expressed interest in adopting the twins when they were three or four weeks old, but they were only interested if the mother and the father would not be involved. DHR was not prepared to pursue termination of parental rights at that time, and, as a result, this relative had no further contact with DHR. DHR contacted this relative immediately before the final hearing and requested that the Lee County Department of Human Resources complete a home study on this relative, but nothing ever materialized as a result of that request.
Irene Johnson testified that DHR had conducted individualized service plan ("ISP") meetings on a regular basis until August 2006. At that time, DHR closed its file. Since August 2006, DHR has not interviewed or had contact with the mother or the father. Johnson acknowledged that, before that date, the mother and the father had had supervised visitation at the DHR office. However, after DHR closed its file, the mother and the father no longer had supervised visitation through DHR; they then had to contact the children's custodian to request visitation. Johnson did not know if the mother or the father had had any contact with the twins since August 2006.
Irene Johnson stated that DHR had made efforts at rehabilitation and reunification from January 2006 through August 2006; she testified that, as of August 2006, DHR had exhausted all available options regarding rehabilitation and reunification. In Johnson's opinion, DHR had attempted all viable means of returning the twins to their mother's custody, and she saw no alternative to termination of parental rights. However, DHR had not sought to terminate the mother's or the father's parental rights because the custodian had already petitioned to do so.
On cross-examination, Irene Johnson identified the rehabilitative efforts that DHR had made in this case with the mother: DHR had set up 24-hour supervision to assist the mother in caring for the children; DHR had obtained psychological evaluations on the mother from Dr. Faison; *287 DHR had provided counseling to the mother with Dr. McCloskey; DHR had referred the mother to Hope Place for parenting classes; DHR had provided the mother with transportation when needed; DHR had provided "case aid"; and DHR had advocated for the mother to keep her apartment when the complex was threatening to evict her due to domestic-violence issues. Johnson denied that any relatives had come forward to offer themselves as potential relative placements in this case.
S.F., the custodian of the twins, testified that, at the time of trial, she was 55 years old. She was divorced and was working as a custodian at a local high school. She worked from 8:00 a.m. until 3:30 p.m. during the week. She had previously worked at a day-care facility, caring for infants. S.F. lived in a three-bedroom apartment; she lived there with her daughter and her three grandchildren and the two children at issue in this case. However, the daughter and the three grandchildren were only living there temporarily; they were not financially dependent on S.F. DHR had performed a home study on S.F. and had approved placement of the twins with her. S.F. had taken the twins into her home because they had needed a place to stay; she and the mother attended the same church, and S.F. had learned of the situation through her church.
After S.F. had been awarded temporary custody of the twins and the mother and the father had been granted supervised visitation, that visitation began at S.F.'s apartment. The mother did not regularly attend her visitation, and she did not stay for the full hour. S.F. observed during one of the visits that the mother did not have the basic skills to change the twins' diapers. The father never came to the visitations at S.F.'s apartment. S.F. testified that the mother had subsequently decided not to visit with the twins in S.F.'s home any longer and that the visits had then been moved to DHR's offices.
Because S.F. attended the same church as the mother, S.F. had offered to take the mother to church with her, allowing the mother an opportunity to see the twins on Sundays. However, the mother subsequently stopped going to church with S.F.
S.F. testified that since August 2006 the mother had not requested to visit with the twins. The father had called to ask if he could visit with the twins, and S.F. had told him he could visit with them at church but not at her apartment. The father had showed up at the church one time, but he would not go inside the church. According to S.F., since she had taken the twins into her home in March 2006, the parents had each given her $40 in financial assistance for the twins.
S.F. testified that, while she worked, the twins stayed in a DHR-approved day-care facility. She testified that her income was sufficient to provide for the twins' needs and that the twins could be added to her employer-provided health-insurance plan if she adopted them. S.F. acknowledged that she had high blood pressure, but she stated that she had no other health issues that might prevent her from properly caring for the twins.
S.F. intended to allow the mother to continue visiting the twins if the mother wished to do so. She encouraged a relationship between the mother and the twins. On cross-examination, S.F. admitted that the mother had called one Saturday asking to visit with the twins but that S.F.'s schedule had conflicted with that request.
The mother testified at the hearing. At the time of the hearing, she was living in an apartment and had been living there for five years. The twins were 19 months old at the time of the hearing. The mother *288 testified that she had lost custody of the twins before they were born and that DHR had worked out a plan for her to get them backthe ladies at her church were going to help the mother get the twins back. The mother testified that DHR had told her she needed to work on her parenting skills before she could get the twins back.
The mother claimed that the volunteers who came to her home had not allowed her to do anything for the twins and that they had done everything themselves. The mother claimed that they would not allow her to even take the twins into the next room. The mother claimed that she had suffered from postpartum depression during the time that all the volunteers had been in her home and that they had been "right on me every move I make [sic].... [I]t got on my nerves."
The mother testified that she had cared for her other children and they had never gone without food and that she had had to give them medication. She also had paid her own bills, cooked for her family, and cleaned her own home before. Although her seven-year-old daughter had lived with her paternal grandmother since she was six weeks old, that daughter had spent every weekend with the mother from Friday until Sunday for unsupervised visitation and had done so for the past five years (since the daughter was two years old). The mother testified that she had been able to get her seven-year-old daughter dressed and ready to be picked up by the paternal grandmother on time and, thus, asserted that she was able to follow a schedule.
The mother had had gall-stone surgery shortly after having her cesarean-section delivery of the twins. She claimed that that had been the only reason she had had difficulty changing a diaper. The mother testified that Rhonda Johnson had come into her home to help her with parenting skills and that Johnson was supposed to have been in the home for six weeks but had stopped coming after two weeks.
The mother claimed that she had taken care of children before and that she was capable of holding down a job and of facing all the tasks of daily life. She denied ever having had a drug or alcohol problem. The mother claimed that she and the father were getting along better now that they no longer lived together.
On cross-examination, the mother admitted that she had given birth to five children and that, at the time of the trial, she had custody of none of them. The seven-year-old child had been in her paternal grandmother's custody since she was six weeks old; the other two children had been legally adopted by other relatives.
The mother testified that she was working in a catalog-sales business; the most she had ever made from this business in one month was $120. She also received $450 in Social Security income due to her learning disability. The mother had received assistance from DHR in paying her rent once.
The mother claimed that she had completed her parenting classes at Hope Place but admitted that she had not received her certificate from that program. The mother denied that she and the father had been involved in multiple domestic-violence incidents; she claimed there had been only one incident and that the incident had involved no physical violence. She admitted that the father had not always taken his medication for schizophrenia.
On cross-examination, the mother admitted that her cousin had not gone to DHR to volunteer to assist the mother. The mother admitted that the cousin worked full-time. The mother stated that Dr. McCloskey had indicated to her that he *289 believed she might have been suffering from postpartum depression because she had cried so frequently but that no other professional had ever diagnosed the mother with that condition.
On October 3, 2007, the juvenile court entered its judgment terminating the parental rights of the mother and the father. The mother appealed; the father did not.

Analysis
Under Alabama law, a juvenile court may terminate a parent's rights to a child if the State proves by clear and convincing evidence that grounds for termination exist. See § 26-18-7, Ala.Code 1975; and Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). "Clear and convincing evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting § 6-11-20(b)(4), Ala.Code 1975).
Section 26-18-7(a), Ala.Code 1975, a part of the 1984 Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, specifies grounds for terminating parental rights. Section 26-18-7 provides, in part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the juvenile court shall consider,... but not be limited to, the following:
"....
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"....
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"....
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an *290 administrative review or a judicial review."
Further, if the termination of parental rights has been initiated by a nonparent, as is the case here, the court must find by clear and convincing evidence that no viable alternative to termination exists. See A.D.B.H. v. Houston County Dep't of Human Res., [Ms. 2060699, March 21, 2008] ___ So.2d ___, ___ (Ala.Civ.App.2008).
From our review of the record in this case, we conclude that clear and convincing evidence was presented from which the juvenile court could have found that the mother was "unable ... to discharge [her] responsibilities to and for the [twins]" and from which the juvenile court could have concluded that the "conduct or condition of the [mother] is such as to render [her] unable to properly care for the [twins] and that [the mother's] conduct or condition is unlikely to change in the foreseeable future." § 26-18-7(a).
The evidence presented at trial established that the mother has suffered from a mental deficiency all of her life. Multiple professionals involved in this case all reached the same conclusion: the mother's mental deficiency is such that she cannot safely provide for the daily needs of the twins without 24-hour supervision.
We also note that the mother appears unable to provide any financial support for the twins. The mother's income was approximately $500 a month, including her disability income. During the time that the twins lived with S.F., the mother had provided $40 in child support to S.F. for the benefit of the twins.
There was some evidence presented indicating that the mother had not maintained regular visitation and regular contact with the twins. S.F. testified that the mother had not taken advantage of the visitation afforded to her at church and that the mother had not regularly stayed for the full hour allowed to her by DHR. Additionally, S.F. testified that after DHR had closed its file in August 2006 the mother had not requested any visitation with the twins.
Additionally, DHR made reasonable efforts to rehabilitate the mother, but those efforts failed. DHR offered the mother 24-hour in-home supervision, parenting classes, long-term counseling, financial assistance, and transportation. However, even with this degree of assistance and effort, the mother was not capable of performing the basic repetitive daily chores that are part and parcel of raising children. We need not determine whether this was due to the mother's failure to try or due to the nature of the mother's mental deficiency; the fact is that the mother remained incapable of providing for the twins' needs. The psychologist and the counselor both testified that the mother struggled to provide daily care for herself and her home and that she could not maintain a schedule. The mother could not remember from day to day how to perform certain daily tasks; her reading, writing, and arithmetic skills were on the first-grade level. The professionals involved in this case concluded that she could not safely provide daily care for active and growing twins.
The mother argues on appeal that she was not allowed sufficient time to rehabilitate herself in this case. She argues that from the time DHR became involved in this case, January 2006, until the time that DHR's efforts ceased, August 2006, only eight months had elapsed, which she deemed an unreasonable amount of time for rehabilitation efforts.
In 1998, our legislature, in response to the passage of the federal Adoption and Safe Families Act ("the ASFA"), enacted § 12-15-62(c), which requires juvenile *291 courts to hold a permanency hearing to determine a child's disposition within 12 months of the date the child first entered foster care. See A.D.B.H. v. Houston County Dep't of Human Res., ___ So.2d at ___ (Moore, J., concurring in part and concurring in the result). Based on similar statutory provisions in their states, many other courts have concluded that their legislatures have established 12 months as a presumptively reasonable time for a parent to rehabilitate so as to be able to reunite with the child. See Kurtis A. Kemper, Annotation, Construction and Application by State Courts of the Federal Adoption and Safe Families Act and Its Implementing State Statutes, 10 A.L.R. 6th 173, 193 (2006). We have recognized that, "[a]t some point, ... the child's need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent." M.W. v. Houston County Dep't of Human Res., 773 So.2d 484, 487 (Ala.Civ. App.2000). Consistent with that statement, and the purpose behind the ASFA and § 12-15-62(c) to "ensure `that children are provided a permanent home as early as possible,'" A.D.B.H., ___ So.2d at ___ (Moore, J., concurring in part and concurring in the result) (quoting Kemper, 10 A.L.R. 6th at 193), we hold that when DHR timely exerts reasonable rehabilitation and reunification efforts, the parents generally shall have 12 months from the date the child enters foster care to prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved.
We have also held that "[t]he point at which the child's needs overcome the parent's right to be rehabilitated must be determined based on the facts of each individual case." Talladega County Dep't of Human Res. v. M.E.P., 975 So.2d 370, 374 (Ala.Civ.App.2007). That statement recognizes that there may be cases in which the circumstances dictate that a lesser or greater period of rehabilitation would be reasonable. Due to the emphasis on prompt permanent disposition of children in foster care, the juvenile courts should only extend the period of rehabilitation when the evidence establishes that a limited additional amount of time or effort will necessarily result in the rehabilitation of the parent and accomplishment of the goal of family reunification or that an equally "compelling reason" justifies additional time. See Ala.Code 1975, § 12-15-62(c).
On the other hand, a juvenile court may shorten the period of rehabilitation when the circumstances indicate that further rehabilitation efforts would be futile or unavailing or, for some other reason established by the evidence, would unduly prolong the permanent disposition of the child. Juvenile courts should give parents a reasonable opportunity to rehabilitate, and reasonable rehabilitation efforts should continue at least to the time of the permanency hearing so long as the parent is progressing toward the ultimate goal of family reunification. But if the evidence clearly establishes that the parent is not progressing and that further rehabilitation efforts would not help achieve the overall goal of family reunification, it would be unreasonable to continue such efforts simply out of acknowledgment of the 12-month deadline set out in § 12-15-62(c).
The mother correctly notes that DHR ceased its rehabilitation and reunification efforts eight months after the twins were placed in foster care. However, the mother fails to acknowledge that DHR had been involved with her since 2000 and had removed three other children from her care for the very same reasons raised in this case. During that time, despite reasonable efforts expended by DHR, the mother *292 had been unable to rectify the problems in her home. In connection with this case, DHR worked with the mother on an intensive basis during the eight-month period at issue, without success and with every indication that further efforts would not be successful. The mother does not argue that DHR's efforts were unreasonable; she simply asserts that the length of time DHR exerted those efforts was unreasonable. We reject that argument. Based on these circumstances, the juvenile court reasonably could have concluded that an adequate amount of time and effort had been expended in an attempt to rehabilitate the mother but that further time and effort would not help achieve the goal of family reunification in light of the mother's lack of progress over a seven-year period. We note that the law speaks in terms of "reasonable" efforts, not unlimited or even maximal efforts. In this case, DHR used reasonable efforts to rehabilitate the mother, and the juvenile court did not err in concluding that it would be unreasonable to prolong those efforts.
In addressing viable alternatives to termination, the mother argues that DHR should have assigned another social worker to come into the mother's home to work with her and the twins rather than terminating her parental rights. In Miller v. Alabama Department of Pensions & Security, 374 So.2d 1370 (Ala.Civ.App.1979), the court observed that a juvenile court could, as a viable alternative to termination of parental rights, "consider returning the child to parental custody on a trial basis subject to certain definite conditions being met and subject to supervision by DPS workers or other trained personnel...." 374 So.2d at 1374. In addition, Ala.Code 1975, §§ 12-15-71(a)(1) and (a)(2), grant the juvenile court the option of placing the child with the parent with DHR supervision if it is in the best interests of the child at issue. In this case, clear and convincing evidence establishes that DHR provided trained professionals to assist and monitor the mother's interaction with the twins in her home environment but that the mother did not exhibit any consistent understanding of how to properly parent the twins. The evidence further established that the mother could only discharge her parental responsibilities in the future with constant supervision and that merely replacing the mother's past supervisors with another social worker on a temporary basis would not have achieved any lasting effect on the mother's parenting abilities. However, neither the legislature nor the appellate courts of this state have endorsed placement of a DHR representative in the home on a permanent basis as a viable alternative to termination. See J.J. v. Lee County Dep't of Human Res., 979 So.2d 823 (Ala.Civ.App.2007) (plurality opinion). Therefore, we reject the mother's argument on this point.
We also reject any contention that, instead of terminating the mother's parental rights, the juvenile court should have maintained temporary custody of the twins in S.F.'s care while continuing rehabilitative efforts with the mother. As we have already decided, the juvenile court correctly ended the mother's rehabilitation period eight months after the twins entered foster care when it became clear that any further rehabilitation efforts would not have enabled the mother to successfully reunite with the twins. After that point, the law required the juvenile court to make a permanent disposition of the children. See Ala.Code 1975, § 12-15-62(c). Continuing temporary custody with S.F. would not only have served no beneficial purpose, see D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 95 (Ala.Civ.App.2003) (plurality opinion) (arguing that placement with third party is not a viable alternative in cases in which parent is deemed "irremediably *293 unfit"), it would have been contrary to the law.
For the foregoing reasons, the judgment of the juvenile court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMAS, J., concurs in the result, without writing.
NOTES
[1] Because the father has not appealed the termination of his parental rights, much of the information relevant to him has been omitted. However, certain information regarding the father is presented herein to establish the circumstances of the mother's home and her relationships at the time of DHR's investigation.
[2] The record does not contain copies of any shelter-care orders or dependency orders, and the testimony offered at the termination hearing conflicted as to when S.F. obtained temporary custody of the twins. At one point, the record indicates that the twins were placed in S.F.'s custody when the twins were six weeks old. S.F. testified that she had obtained custody of the twins in August 2006; the twins would have been seven to eight months old in August 2006.